## ST. JOSEPH TOWNSHIP *v.* ROGERS.

A statute of Illinois, by a twelfth section, authorized any township along the route of a railroad named, to subscribe to its stock ;

But enacted by a thirteenth, that no subscription should be made until notice had been given to the legal voters, to meet for the purpose of voting on the matter. "*Provided*" that where elections had been already held "and a *majority of the legal voters of any township*" were in favor of a subscription, no further election should be necessary to be held.

A fourteenth section enacted that "if it shall appear that *a majority of all the legal voters of such townships voting at such election*, shall have voted *For Subscription*,' it shall be the duty of the supervisor to subscribe to the capital stock, &c., the amount so voted to be subscribed, and to receive from the company the proper certificates therefor."

A fifteenth section enacted that it should be " the duty of the clerk of any township in which a vote should be given in favor of subscription, within ten days thereafter, to transmit to the county clerk of the respective counties a transcript of the vote given and the amount so subscribed, and the rate of interest to be paid. *Provided*, that where elections may *have been held as aforesaid*, it shall be the duty of the town clerks to file with the county clerks, &c., within ten days after the issuing of said bonds certificates of the votes of their towns, the amount of stock voted to be subscribed, the amount of bonds issued, and the rate of interest payable thereon."

Of a minority of the legal voters of St. Joseph Township voting before the act was passed, at an election called and held, a majority voted in favor of subscription, and the supervisor and clerk professing to act for the township, issued bonds to the amount voted ; but no record of any kind was ever kept of the election, nor was any record or transcript ever transmitted to the county clerk.

After this an act was passed reciting that "township officers along the line

of the road had failed to keep a full and perfect record of elections called and held, and township clerks had failed to file with the county clerk certificates as required " by the above-quoted act, and enacting that where *such* informalities and neglect may have occurred, and bonds have been issued, to aid in the construction of said railroad, that no *such* neglect or omission on the part of township officers shall in any way invalidate or impair the collection of said bonds:

On this case in favor of a *bonâ fide* holder for value of the bonds, *held*—

1. That even in the case of an election held *prior* to the passage of the first-mentioned act, a majority of the legal voters of the township voting at an election, was sufficient to authorize a subscription, although all the voters voting on both sides were together but a minority of all the legal voters of the township.

2. That if this were not so, yet the second act " entirely obviated *all* the mistakes and irregularities in the prior proceedings."

3. That, in addition, the fourteenth section of the original act made it the duty of the supervisor who executed the bonds to determine the question whether an election was held, and whether a majority of the votes cast were in favor of the subscription, and inasmuch as he passed upon that question and subscribed for the stock and subsequently executed and delivered the bonds, it was clearly too late to question their validity where they were in the hands of an innocent holder.

Error to the Circuit Court for the Southern District of Illinois.

Rogers brought assumpsit in the court below against St. Joseph Township, Champagne County, Illinois, to recover interest on certain railroad bonds alleged to have been issued by said township. The township set up that the bonds were not properly issued, and void.

The case was thus:

On the 28th of February, 1867, the legislature of Illinois passed " an act to amend the articles of association of the Danville, Urbana, Bloomington, and Pekin Railroad Company, and to extend the powers of and confer a charter upon the same." In its material parts the act read thus:

" Section 12. To further aid in the construction of said road by said company, any incorporated town or townships, along the route of said road, may subscribe to the capital stock of said company in any sum not exceeding $250,000.

" Section 13. No such subscription shall be made until the question has been submitted to the legal voters of such incorpo-

ration, town or township in which the subscription is proposed to be made. And the clerk of each of said towns or townships is hereby required, upon the presentation of a petition signed by at least ten citizens who are legal voters, to post up notices, &c., notifying the legal voters of such town or township to meet at the usual place of holding elections in such town or township, &c., for the purpose of voting for or against such subscription, *Provided, that where elections may have already been held, and a majority of the legal voters of any township or incorporated town were in favor of a subscription to said railroad, then, and in that case, no other election need be had; and the amount so voted for shall be subscribed as in this act provided; and such elections are hereby declared to be legal and valid, as though this act had been in force at the time thereof; and all the provisions hereof had been complied with.*

"Section 14. If it shall appear that *a majority of all the legal voters of such towns or townships, voting at such election,* have voted 'For Subscription,' it shall be the duty of the president of the board of trustees, or other chief executive officer, if in incorporated towns, and of the supervisor in townships, to subscribe to the capital stock of said railroad company, in the name of such town or township, the amount so voted to be subscribed, and to receive from said company the proper certificates therefor. He shall also execute to said company, in the name of such town or townships, bonds bearing interest at ten per cent. per annum, which bonds shall run for a term of not more than twenty years, and the interest on the same shall be made payable annually; and which bonds shall be signed by such president, executive officer, or supervisor, and be attested by the clerk of the town or township in whose name the bonds are issued, and it shall be his duty to make out a record of the issuing of said bonds. Said bonds shall be delivered to the president or secretary of said company, for the use of said company. And when any city or county shall hereafter vote to make subscription, as aforesaid, the chairman of the board of supervisors of such county and the mayor of such city shall be required to subscribe to the capital stock of said company the amount so voted.

"Section 15. It shall be the duty of the clerk of any such town or township in which a vote shall be given in favor of subscription, within ten days thereafter, to transmit to the county

·clerk of their respective counties a transcript on statement of the vote given, and the amount so voted to be subscribed, and the rate of interest to be paid, *Provided* that where elections may *have been held as aforesaid*, it shall be the duty of the town. clerks to file with the county clerks of their respective counties, ·within ten days after the issuing of said bonds, certificates of the votes of their towns, the amount of stock voted to be subscribed, the amount of bonds issued, and the rate of interest payable thereon."

On the 25th of February, 1869, the same legislature passed an act entitled "An act to amend articles of association of the Danville, Urbana, Bloomington, and Pekin Railroad Company, and to extend the powers of and confer a charter upon the same." It was thus:

"Whereas, certain township officers along the line and through which the Danville, Urbana, Bloomington, and Pekin Railroad passes, have failed to *keep a full and perfect record of elections called and held,* and township clerks have *failed to file with the county clerk, certificates, as required by section fifteen of the amended articles of association of said railroad,* therefore,

"Section 1. *Be it enacted,* where *such* informalities and neglect may have occurred, and bonds have been issued to aid in the construction of said railroad, that no *such* neglect or omission on the part of township officers, shall in any way invalidate or impair the collection of said bonds, both principal and interest, as they may respectively fall due," &c.

So far as to the legislation in the case.

On the trial the plaintiff gave in evidence different bonds, dated October 1st, 1867, issued by the *supervisor and clerk* of the township, purporting that the township acknowledged itself to owe so much money, which it promised to pay the bearer, with interest, at ten per centum per annum, yearly on the 1st of October.

The bond recited that it was issued by virtue of a law of the State of Illinois, entitled:

. "'An act to amend the articles of association of the Danville, Urbana, Bloomington, and Pekin Railroad Company, and to extend the powers of and confer a charter upon the same,' ap-

proved February 28th, 1867, and in accordance with the vote of the electors of said township at the special election held August *fourteenth*, 1866, in accordance with said act."

On the other hand evidence was given by the township, tending to show that the election held for the purpose of deciding whether the township would subscribe stock, was held on the *fourth* of August, 1866, and, of course, before the passage of the act of February 28th, 1867, incorporating the company, and that at the time of the election there were three hundred legal voters in St. Joseph Township, of whom only seventy-five persons voted at the election; a majority of the seventy-five only voting in favor of the issuing of the bonds; that no poll-book or record of any kind was made or kept of the election, and that no record or transcript of the proceedings at it was ever transmitted to the county clerk.

The plaintiff in reply relied on the recitals in his bonds, on the fourteenth section of the act, and on the amendatory or curative act.

The question of course was, whether under the two acts above quoted, and the facts of the case, the bonds were valid.

The court gave these instructions:.

"1st. The election held in August, 1866, as declared in the evidence, was validated by the act of February 28th, 1867, so as to authorize the defendant to subscribe for stock in the Danville, Urbana, Bloomington, and Pekin Railroad, and to issue the bonds in question; and when the stock was subscribed and the bonds issued, the bonds are binding on the defendant in the hands of a *bonâ fide* holder.

"2d. The recitals in the bond estop the defendant from denying the fact of a valid election as against a *bonâ fide* holder of the bonds or coupons attached thereto."

Verdict and judgment having gone accordingly, the township brought the case here.

*Messrs. William Lawrence and C. B. Smith, for the plaintiff in error:*

Negotiable bonds issued by a municipal corporation,

without any authority of law, are void even in the hands of an innocent purchaser.*   This all will admit.

2. A statute which authorizes township officers to issue bonds only when an election "may have already been held, and a *majority of the legal voters of the township* were in favor" thereof, does not authorize the issue of bonds when *less* than a "majority of the legal voters" were in favor thereof, although there were "a majority of all the legal voters *voting at such election.*"

If bonds are issued in such case they are issued without authority of law, and are void even in the hands of a *bonâ fide* holder.

The act of February 28th, 1867, confers power on incorporated townships in two classes of cases.

In one, the power is given to be exercised *after* the question "has been submitted to the legal voters of the township," and when "it shall appear that a majority of all the legal voters of such township, *voting at such election,*" have voted therefor, &c.

In the other class—the class provided for by the *proviso*—no future vote is to be had, but townships are authorized to issue bonds only in cases "where elections may *have already been held* (without authority of law before the statute was passed), and (only in those cases when) a *majority of the legal voters of any township were in favor of* a subscription." This class is *sui generis.*

The bonds now in controversy recite that they were issued under this statute, "and in accordance with the vote of the electors of said township, at the special election, held August 14th, 1866, in accordance with said act." This, of course, was *prior to the date of the act,* and the bonds now in controversy belong to the second class.

The charge held that a *majority of those voting,* though those voting were a minority of the legal voters of the township, was sufficient if *they* voted in favor of bonds to authorize their issue.

---

* Marsh v. Fulton County, 10 Wallace, 676.

This we deny, and insist that *a majority of all the legal voters of the township* was requisite, because :

1. The *language* of the *proviso* to section fourteen, of the act of February 28th, 1867, upon every principle of interpretation clearly so requires. There is no room, therefore, for construction.

2. There is a *manifest reason* why the legislature would, in this class of cases, require a majority of all the voters, since the vote, when had, was unauthorized, and voters had no motive to attend and indicate their wishes.

3. The language employed as to elections *to be held* after the statute was passed, when contrasted with that as to *past elections*, clearly indicates that the legislature intended in one class, as the statute says, to require only " a majority of all the legal voters voting at such election," while in the other, as the statute declares, " a majority of (all) the legal voters of the township" is requisite.

Nor can the opening language of the fourteenth section apply to the case provided for by the proviso to the thirteenth, and cure an omission to comply with *its* directions in the case for which *it* provides. It refers, of course, to that part of the section prior to the proviso. Otherwise we have two contradictory enactments for the same case.

4. Where a legislative act confers authority on a municipal corporation to issue negotiable bonds only in cases where a *past fact exists*, a false recital of the existence of such fact in bonds issued neither estops the corporation from denying it, nor raises a presumption of its existence, even in favor of an innocent holder of such bonds, nor excuses him from the duty of ascertaining if such fact exists.

The false recital of *such* fact cannot make applicable and operative a legislative act otherwise inapplicable and inoperative. The charge to the jury as made in the court below goes much further than to assume that if a majority of those voting at an election voted in favor of bonds, then bonds issued would be valid in the hands of an innocent holder. The charge was given on evidence tending to show that no vote was taken on the question of issuing the bonds now in

controversy, and certainly none on the 14th of August, 1866, the date recited in the bonds. Yet the charge was that "The recitals in the bonds estop the defendant from denying the fact of a valid election as against a *bonâ fide* holder of the bonds or coupons attached thereto." The effect of this is that if a *minority* vote of all the electors of the township, or if *no vote at all* was had, bonds issued reciting a vote are valid in the hands of a *bonâ fide* holder. But this, as has been shown, cannot be so, if the want of a vote, or the want of the requisite majority vote, goes to the question of power to issue the bonds, as it does in this case.

There is not much difficulty in distinguishing between negotiable securities executed *ultra vires*, and those issued within the power of municipal corporations.

The cases on this subject fall within two classes:

One class is where a power is given to a corporation *in præsenti*, but the power is to be exercised "on certain conditions," as it is said in *Knox County v. Aspinwall;* * or as it is elsewhere expressed,† where there are "qualifications coupled with the grant of power." There is a large class of such cases, but they relate to the question of the *regularity* of the exercise of power, and of votes taken, &c. Here it has been held by some courts, and denied by others, that when bonds are issued reciting the proper vote, or even without the recital, but when a vote has in fact been had, that *bonâ fide* purchasers of bonds have a right to presume that the corporation has *regularly* complied with "the conditions," because this is a fact within their peculiar knowledge, and on grounds of justice the corporation is estopped from denying it, and upon the principle that they may not take advantage of their own wrong. But in this class "the conditions" to be performed are all *subsequent* to the grant of power, mere qualifications coupled with the grant, and none of them hold that where the power is by law made dependent on a vote of electors, and no vote, or only a minority vote, is had, that a recital in the bonds can supply the want of power to issue them.

---

* 21 Howard, 546.  † Gelpcke *v.* Dubuque, 1 Wallace, 203.

But there is another class of cases where there is a total absence of any power to issue bonds by a municipal corporation. One of these is where a power is given only *when a past fact happens to exist,* as the foundation of the power. If there be no foundation on which the power can rest, it cannot exist. Here there are no "certain conditions" which accompany the power to be performed. Here there are no "qualifications coupled *with* the grant of power," for no power has ever been granted, and none ever existed under "any circumstances,"* because as the power is only to be given in case a certain past fact exist, the non-existence of the fact carries with it the non-existence of the power.

Now, in this class of cases, the fact on which the power depends is not "peculiarly within the knowledge of the corporation," and there can be no *estoppel,* and in such case there is no presumption that officers have *regularly* performed any duty, because it is not a question of official duty *to be performed,* but a question of the existence of a past fact, which, in the case now under consideration, was a voluntary, unofficial, unauthorized act. Such facts can be as readily ascertained by bondholders as by corporate authorities. There is no question in such case either as to the directory character of the provisions of the statute, for the essential fact on which the power depends for its existence is past, not *in futuro,* and is vital to the power itself.

The case now under consideration falls within this class.

In *Gould* v. *Town of Sterling,*† it was held that where a town had issued negotiable bonds, which could only be issued when the written assent of two-thirds of the resident persons taxed in the town had been obtained and filed in the county clerk's office, the bonds issued without such assent were invalid; and that the purchaser of them could not rely upon the recital in the bonds that such assent had been obtained: and Cooley in his Constitutional Limitations, in commenting on this and other cases, says:

"The doctrine in the case of *Gould* v. *Town of Sterling* appears

---

* 1 Wallace, 175.                    † 23 New York, 458.

to us to be sound, and that wherever a want of power exists a purchaser of the securities is chargeable with notice of it, *if the defect is disclosed by the corporate records*, or as in that case by other records where the power is required to be shown."

5. A statute which attempts to create a municipal debt where none existed before, as by attempting to validate void bonds, is unconstitutional and void.

This principle, and the application of it to this case, are perhaps sufficiently shown in what has already been said.

The curative act of February 25th, 1869, in fact cannot be construed as applicable to the bonds now in controversy. Its preamble relates more especially to the omission to "keep a full and perfect record of electors," and "to file with the county clerk certificates as required by section fifteen of" the act of February 28th, 1867. It enacts that if *such* informality and neglect may have occurred they shall not invalidate bonds. But if it can apply to the *proviso* of section fifteen of the act of 1867, and the duty of town clerks to file certificates of votes had prior to the act, so far as it attempts to give validity to what was invalid before, it is an attempt by legislative act to create a debt.*

6. Bonds issued by municipal authorities reciting a vote on the 14th of August, cannot be sustained on a vote taken on the 4th of August, when the law under which they are issued requires a vote of electors to authorize their issue.

There is evidence tending to show that a vote was had August 4th, but no evidence tending to show there was any vote August 14th. There was no vote August 14th. Now if the vote taken August 4th authorized any bonds to be issued, it is fair to presume they were issued. On that hypothesis the power existed, and could be used to issue bonds reciting a vote of that date. Nothing in the record shows bonds were not so issued.

7. The fifth section of the ninth article of the constitution of Illinois, of 1848, provides that:

---

* Marshall *v.* Silliman, Supreme Court of Illinois, January, 1872; see McDaniel *v.* Correll, 19 Illinois, 228; 11 Id. 54; 14 Id. 223; 15 Id. 125–481; 35 Id. 363; 37 Id. 88; 48 Id. 212; Cooley's Constitutional Limitations, 382.

"The *corporate authorities* of counties, townships, school districts, cities, towns, and villages, may be vested with power to assess and collect taxes *for corporate purposes;* such tax to be uniform in respect to persons and property within the jurisdiction of the body imposing the same."

In *Howard* v. *St. Clair and M. L. and D. Company,* it was held that this section

"Was to be construed as a limitation upon the power of the legislature to delegate the right of corporate or local taxation to any other than the *corporate or local authorities,* and that by the phrase 'corporate authorities' must be understood *those municipal officers who are either directly elected* by the people to be taxed, or appointed in some mode to which they have given their assent."[*]

By the township organization law, in force in St. Joseph Township, the "corporate authorities," or municipal officers "elected by the people," were, when the vote was had and bonds issued in this case, "one supervisor, one town clerk, one assessor, one collector," &c.[†]

The township cannot be made liable on bonds issued *only* by the supervisor and clerk, in favor of a railroad company in payment of a subscription by such officers, made in the name of the township, to the capital stock of such company, without the consent of a majority of the qualified voters of such township, given in favor of such subscription and issue of bonds, after the enactment of a law authorizing them.

8. It is error for the judge in charging a jury in the trial of an issue of fact, to assume the existence of a disputed material fact in issue.

The record shows that one of the disputed questions of fact on the trial in the Circuit Court was whether an election was held in August, 1866, yet the judge charged the jury that "the election held in August, 1866, as detailed in the evidence, was validated by the act of February 28th, 1867," &c. This charge *assumes* a controverted fact, and instructs

---

[*] People ex rel. *v.* Mayor, &c., 51 Illinois, 30.

[†] Act of February 20th, 1861, Gross's Laws, 744.

the jury accordingly. The objection now taken, though technical, is good, and one on which courts have reversed judgments.*

*Mr. H. C. Burchard, contra:*

The point mainly relied on by the counsel of the plaintiff in error is, that the majority of all the legal voters of the township did not vote in favor of the election. But independently of the impossibility of the supervisors knowing otherwise than by the election who all the legal voters were, it is to be observed,.

I. That the counsel, in point of fact, would completely change the order of the provision as found in the act. They transfer the proviso of the thirteenth section from that section where it occurs, and apply it to the fourteenth section following, as though it read,

"The supervisor shall subscribe if it shall appear that a majority of the legal voters voting at such election have voted for subscription, *provided* that where elections may have already been held and a majority of the legal voters of any township were in favor of a subscription to said railroad, then and in that case no other election need be had."

By what authority do counsel thus treat an act of the legislature?

II. That the phrase "a majority of the legal voters of any township," as used in the thirteenth section, is no broader than the phrase "a majority of all the legal voters of such townships voting at such election," used in, section fourteen, but the latter expression only states more fully what the former implies. This appears in various ways.

1st. It is apparent from the provisions of section fifteen of the act which required the town clerks to file with the county clerks "certificates of the votes of their towns." If a majority of all the voters residing in the townships were necessary, whether voting or not, the certificate of votes

* Tracy *v.* Swartwout, 10 Peters, 80; United States *v.* Laub, 12 Id. 1; Games *v.* Stiles, 14 Id. 322.

cast at the election would be valueless without some provision for ascertaining the number of actual legal voters in the township.

2d. Phraseology, almost identical with that of this statute, occurs in section five, article seven, of the constitution of the State of Illinois, which forbids the removal of a county seat " until the point to which it is proposed to be removed shall be fixed by law, and a *majority of the voters of the county* shall have voted in favor of its removal to such point;" yet the Supreme Court of Illinois, in construing this section and the phrase " voters of the county," held

" That the voters of the county referred to were *the voters who should vote at the election authorized by it.* We hold, therefore, that a majority of the legal votes cast at this election is sufficient to determine the question of a relocation of the county seat."*

Similar language is used in section six of the same article of the constitution of the State of Illinois, which, in *People* v. *Garner,*† received a similar construction from the Supreme Court of the State. The same construction has been given by the Supreme Court of Tennessee.

" A majority of the voters of the county," says the court in *Louisville and Nashville Railroad* v. *County Court of Davidson County,*‡ " means a majority of those who actually vote."

It equally prevails in Missouri. In *State* v. *Mayor of St. Joseph,*§ an act of the legislature required a proposition to create a city debt to be submitted " to a vote of the qualified voters of said city," and two-thirds of such qualified voters to sanction the same, and an election had been held at which three hundred and thirty-six votes were for and fifty-eight against the proposition; but the mayor declined to sign the bond, because he was in doubt whether the matter was to be determined by two-thirds of all the votes polled at the special election called to vote on the question, or by two-thirds of all the voters resident in the city absolutely, whether voting

---

* People *v.* Warfield, 20 Illinois, 159.

† 47 Illinois, 246; and see People *v.* Wiant, 48 Id. 263.

‡ 1 Sneed, 637.                    § 37 Missouri, 270.

or not. The court ordered a peremptory mandamus, and in the opinion said:

" We think it was sufficient that two-thirds of all the qualified voters who voted at the special election authorized for the express purpose of determining that question on public notice duly given, voted in favor of the proposition. This was the mode provided by law for ascertaining the sense of the qualified voters of the city upon that question. There would appear to be no other practicable way in which the matter could be determined."

These decisions, and none contrary can be found, overthrow the main defence interposed to the collection of the bonds.

III. The fact as to whether an election had been held, and a majority of the voters were in favor of subscription, was by the fourteenth section to be passed upon and decided by the supervisor.

" If it shall appear," says that section. Appear to whom? Evidently to the officer or officers upon whom the statute imposed the duty of subscribing for the stock and executing the bonds. If it appeared to the supervisor of the township that an election had been held, and a majority of the legal voters were in favor of subscription to the railroad, then he had to act on behalf of the town. Some one had to decide when it had become his duty, and no one else—no other officer—was authorized to determine this for him. The supervisor not being authorized or required to execute the bonds until it should "appear" that a majority had voted for subscription, it was proper that he should find and recite in the bond the fact that must appear to him before he could legally act. Such finding and recital on the bond of his conclusion would conclude the township for which he was authorized to act, as well as himself, as to whether the required majority had voted.

In *Commissioners* v. *Nichols*,[*] it is said:

" A statute, in providing that county bonds should not be de-

---

[*] 14 Ohio (N. S.), 260.

livered by the commissioners until a sufficient sum had been provided by stock subscriptions, or otherwise, to complete a specified railroad, and imposing upon them the duty of delivering the bonds, when said provision has been made, without indicating any person or tribunal to determine that fact, necessarily delegates that power to the commissioners, and, if delivered improvidently, the bonds will not be invalidated."

IV. The act of February 28th, 1867, validated the election and cured any irregularities in holding it.

V. The issue of township bonds could be authorized by the legislature without the vote of the electors of the township.

[This point was largely examined on the constitution and laws of Illinois.]

VI. The plaintiff in error is estopped from attempting to impeach the validity of the bonds, not only by the circumstances under which they were issued, and the action of the officers and citizens of the township, but by the recitals in the bonds.

The second instruction does not assert that the plaintiff in error is estopped from showing that *no* election was held, but from denying the fact of a *valid* election. In the cases where bonds have been held by this or other courts void, an election being required by the statute authorizing their issue, *no* election was held, or the election was as to issuing bonds to *a different corporation from the one to which they were issued*, as in *Marsh* v. *Fulton County*, which was *no election*, or where the power to issue the bonds was denied or prohibited, and, therefore, any election illegal. The instruction presents the proposition that the recitals in the bond protect the *bonâ fide* holder for value, against irregularities or erroneous conclusions of the officers in regard to the election held, which might impeach the bonds in the hands of parties, with notice. Whether the word " valid" intends this qualification or not, the authorities fully sustain the instruction.*

---

* Knox *v.* Aspinwall, 21 Howard, 545 ; Moran *v.* Miami County, 2 Black, 722 ; Mercer County *v.* Hacket, 1 Wallace, 83 ; Gelpcke *v.* City of Dubuque, Ib. 175 ; Van Hostrup *v.* Madison City, Ib. 291 ; Meyer *v.* Muscatine, Ib. 384 ; Supervisors *v.* Schenck, 5 Id. 772 ; Mayor *v.* Lord, 9 Id. 414.

VII. The objection that the election was held on the 4th, instead of the 14th, as recited in the bond, seems sufficiently answered by referring to the law.   It was immaterial on what day the election was held, and it was not necessary to state it in the bond.   It is one of the facts which the recital should make conclusive.

Mr. Justice CLIFFORD delivered the opinion of the court.

Bonds, payable to bearer, issued by a municipal corporation to aid in the construction of a railroad, if issued in pursuance of a power conferred by the legislature, are valid commercial instruments; but if issued by such a corporation which possessed no power from the legislature to grant such aid, they are invalid, even in the hands of innocent holders.

Such a power is frequently conferred to be exercised in a special manner, or subject to certain regulations, conditions, or qualifications, but if it appears that the bonds issued show by their recitals that the power was exercised in the manner required by the legislature, and that the bonds were issued in conformity with those regulations and pursuant to those conditions and qualifications, proof that any, or all, of those recitals are incorrect will not constitute a defence to the corporation in a suit on the bonds or coupons, if it appears that it was the sole province of the municipal officers who executed the bonds to decide whether or not there had been an antecedent compliance with the regulation, condition, or qualification which it is alleged was not fulfilled.

On the 28th of February, 1867, the legislature amended the articles of association of the Danville, Urbana, Bloomington and Pekin Railroad Company, and enacted that any incorporated town or township, in counties acting under the township organization law, along the route of said railroad, may subscribe to the capital stock of said company in any sum not exceeding $250,000.*   No such subscription, however, it was enacted shall be made until the question has been submitted to the legal voters of such town or township

---

* 2 Private Laws (1867), 761.

in which the subscription is proposed to be made. Regula‑ tions are also enacted for taking the sense of the legal voters upon such a proposition, which provide that the clerk of the town or township, upon the presentation to him of a petition stating the amount proposed to be subscribed, signed by at least ten citizens who are legal voters and taxpayers therein, shall post up notices in at least three public places in the municipality, not less than thirty days before the day of holding such election, notifying the legal voters thereof to meet at the usual place of holding elections, or some other convenient place named in the notice, for the purpose of voting for or against such subscription. Prior to the pas‑ sage of that act, however, an election was held in that town‑ ship to determine whether the municipality would subscribe $25,000 to the capital stock of that railroad company, and the proofs show that a majority of all the legal voters of the township voting at the election voted for the subscription— sixty-two votes being cast in favor of the subscription and seventeen against the proposition. Pursuant to the vote at that election the supervisor of the township subscribed, in the name of the municipality, $25,000 to the capital stock of that railroad company, and executed, in the name of the township, the bonds held by the plaintiff, bearing interest at ten per cent. per annum, payable in ten years from date, which bonds were signed by the party issuing the same as such supervisor, and were attested by the clerk of the town‑ ship

Objection is made to the preliminary proceedings because the election approving the subscription was held before the act was passed giving such authority to such municipalities, but two answers are made to that objection, either of which is decisive:

1. By the act conferring that authority it is provided that where elections may have already been held, and a majority of the legal voters of the township were in favor of a sub‑ scription to said railroad, then and in that case no other election need be had, and the amount so voted for shall be

subscribed as in the act is provided; and the provision is that such elections are legal and valid as if the act had been in force at the time thereof, and that all the provisions had been fulfilled.*

2. Because the legislature passed a subsequent act declaring such subscriptions legal and obligatory. Some of the township officers, it seems, failed to keep a full and perfect record of elections called and held to authorize such subscriptions, and that the clerks of the townships failed in some instances to file the necessary certificate with the county clerk, as required by the fifteenth section of the prior act. Omissions and defects of the kind becoming known, the legislature, on the 25th of February, 1869, enacted that where such informalities and neglect may have occurred and bonds have been issued, or may hereafter be issued, to aid in the construction of said railroad, that no such neglect or omission shall in any way invalidate or impair the collection of said bonds, principal or interest, as they may respectively fall due, and that all assessments that are now made for the payment of the principal or interest are hereby legalized, and the township collectors and county treasurers are hereby authorized and empowered to enforce the collection and payment of said tax as is now provided by law for the collection of all other taxes.

Bonds to the amount of the subscription were accordingly issued, bearing date October 1st, 1867, signed by the supervisor and countersigned by the clerk, and each bond contains the recital that it is issued under and by virtue of the aforesaid law of the State, entitled an act to amend the articles of association of the said railroad company, and to extend the powers of and confer a charter upon the same, and in accordance with the vote of the electors of said township at the special election held August 14th, 1866, pursuant to said act, and pledges the faith of the township for the payment of the said principal sum and interest as stipulated in the instrument.

* 2 Private Laws (1867), 762.

Evidence was introduced by the defendants showing that there is no record of the supposed election, when it is alleged that the question of the proposed subscription was submitted to the legal voters of the township, and that no such certificate as that required by the act conferring the authority to subscribe for the stock of the said company is on file in the office of the county clerk, but the plaintiff proved that the alleged meeting was notified, called, and held, and that sixty-two votes were given in favor of the subscription and seventeen against it, as announced at the election.

Two instructions were given by the court to the jury, to which the defendants excepted: (1.) That the election held as described in the evidence was validated by the act of the 28th of February, 1867, so as to authorize the defendants to subscribe for the stock of the railroad company and to issue the bonds in question, and that the bonds having been issued for the stock subscribed, are binding on the defendants in the hands of a *bonâ fide* holder. (2.) That the recitals in the bonds estop the defendants from denying the fact of a valid election as against a *bonâ fide* holder of the bonds or coupons thereto annexed.

Under the instructions of the court the jury returned a verdict for the plaintiff, and the court rendered judgment on the verdict.

Repeated decisions of the State courts have established the rule that the legislature has the constitutional right to authorize municipal corporations to subscribe for the stock of a railroad company, and to issue their bonds to aid in the construction of such an intended improvement; that the supervisors of the municipality have the power, in case such a subscription is authorized, to subscribe for the stock of the railroad company, and to call an election to ascertain the will of the legal voters in that behalf.* Such corporations are created by the legislature and they derive all their powers

---

* Prettyman *v.* Supervisors, 19 Illinois, 406; Robertson *v.* Rockford, 21 Id. 451; Perkins *v.* Lewis, 24 Id. 208; Johnson *v.* Stark, Ib. 85; Keithsburg *v.* Frick, 34 Id. 405; Commissioners *v.* Nichols, 14 Ohio State, 260.

from the source of their creation, and those powers are at all times subject to the control of the legislature. Every where the construction and repair of highways within their limits are regarded as among the usual purposes of their creation, and the expenses of accomplishing those objects are among their usual and ordinary burdens. Railways also, as matter of usage founded on experience, are so far considered by the courts as in the nature of improved highways and as indispensable to the public interest and the successful pursuit, even of local business, that the legislature may authorize the towns and counties of a State through which the railway passes, to borrow money, issue their bonds, subscribe for the stock of the company, or purchase the same to aid the railway company in constructing or completing such a public improvement. Legislation of the kind may be prohibited by a State constitution, but it is settled everywhere that such an act is not in contravention of any implied limitation of the power of a State to pass laws to promote the usual purposes of municipal corporations.*

Argument to show that defective subscriptions of the kind may in all cases be ratified where the legislature could have originally conferred the power is certainly unnecessary, as the question is authoritatively settled by the decisions of the Supreme Court of the State, and of this court, in repeated instances.†

Suppose that is so, still it is insisted by the defendants that the election held to ascertain whether the legal voters of the township would authorize the subscription, was irregular and a nullity: (1.) Because a majority of the legal voters of the township did not vote at the meeting notified and held for that purpose. (2.) Because the meeting was notified and held before the act was passed providing for such an election.

---

* Rogers *v*. Burlington, 3 Wallace, 663; Freeport *v*. Supervisors, 41 Illinois, 495; Butler *v*. Dunham, 27 Id. 474.

† Cowgill *v*. Long, 15 Illinois, 203; Keithsburg *v*. Frick, 34 Id. 405; Thomson *v*. Lee County, 3 Wallace, 327; City *v*. Lamson, 9 Id. 477; Watson *v*. Mercer, 8 Peters, 111; Bissell *v*. Jeffersonville, 24 Howard, 295.

Responsive to the first objection, it is insisted by the plaintiff that the legislature in adopting the phrase " a majority of the legal voters of the township," intended to require only a majority of the legal voters of the township voting at the election notified and held to ascertain whether the proposition to subscribe for the stock of the company should be adopted or rejected, and the court is of the opinion that such is the true meaning of the enactment, as the question would necessarily be determined by a count of ballots.*

Tested by these considerations, it is clear that an election was held within the meaning of the act of the legislature, and that a majority of the legal voters of the township did vote in favor of the subscription, as the proofs show that a meeting was called and held, and that the majority of the legal voters voting at the meeting, voted in favor of the proposition.

Sufficient has already been remarked to show that the second objection cannot avail the defendants, as the same act provided to the effect that if the election had already been held and a majority of the legal voters had voted in favor of the subscription, no other election need be held, and that the amount so voted shall be subscribed, as provided in the same act. Mistakes and irregularities are of frequent occurrence in municipal elections, and the State legislatures have often had occasion to pass laws to obviate such difficulties. Such laws, when they do not impair any contract or injuriously affect the rights of third persons, are never regarded as objectionable, and certainly are within the competency of the legislative authority.

Even if the legislature may by a subsequent act validate and confirm previous acts of a municipal corporation otherwise invalid, still the defendants insist that a prior legislative act will not have any such effect, which cannot be admitted,

---

* People *v.* Warfield, 20 Illinois, 163; People *v* Garner, 47 Id. 246; People *v.* Wiant, 48 Id. 263; Railroad *v.* Davidson County, 1 Sneed, 692; Angell & Ames on Corporations, 9th ed., §§ 499–500; Bridgeport *v.* Railroad, 15 Connecticut, 475; Talbot *v.* Dent, 9 B. Monro, 526; State *v.* The Mayor, 37 Missouri, 272.

as it would be competent for the legislature to authorize a municipal corporation to make such a subscription without requiring any such preliminary election.

Concede, however, that a prior act is insufficient to dispense with the preliminary election, still the concession cannot benefit the defendants, as it is clear that the subsequent act entirely obviates all the mistakes and irregularities in the prior proceedings, as it provides that where such informalities and neglect may have occurred, and bonds have been issued, or may hereafter be issued, to aid in the construction of said railroad, no such neglect or omission on the part of township officers shall in any way invalidate or impair the collection of said bonds, principal or interest, as they may respectively fall due.*   Authorities to support that proposition are hardly necessary, but another answer may be given to the objection quite as satisfactory as either of the others, which is that the fourteenth section of the act makes it the duty of the supervisor who executed the bonds to determine the question whether an election was held, and whether a majority of the votes cast were in favor of the subscription, and inasmuch as he passed upon that question and subscribed for the stock and subsequently executed and delivered the bonds, it is clearly too late to question their validity where it appears, as in this case, that they are in the hands of an innocent holder.†

*Knox County* v. *Aspinwall.*‡   Non-compliance with one of the conditions was clearly shown in that case, as the notices of the election as required by law had not been given in any form, but the decision was that the question as to the sufficiency of the notice and the ascertainment of the fact whether the majority of the votes had been cast in favor of the subscription was necessarily left to the inquiry and judgment of the county board, as no other tribunal was provided for the purpose, and the court held that after the authority had been executed, the bonds issued, and they had passed into

---

* 3 Private Laws (1869), 274; Thomson v. Lee County, 3 Wallace, 327; Gelpcke v. Dubuque, 1 Id. 220; People v. Mitchell, 35 New York, 551.

† Private Laws (1867), 762.                    ‡ 21 Howard, 544.

the hands of innocent holders, it was too late, even in a direct proceeding, to call the power in question, and that it was beyond all doubt too late to call the power in question to the prejudice of a *bonâ fide* holder of the bonds in a collateral way, which is attempted to be done in the case before the court.*

Exactly the same principles were applied in the case of *Royal British Bank* v. *Turquand,*† in which the opinion was given by the chief justice. He said the bond sued upon in the case is allowed to be under the seal of the company and to be their deed, consequently a *primâ facie* case is made for the plaintiff, as the defendants having executed the bond have no defence under the plea of *non est factum,* and consequently the onus is cast upon them of showing that the bond is unlawful and void. No illegality appears on the face of the bond or condition, which shows that the plea, in order that it may be supported, must allege facts to establish illegality, but the plea makes no charge of fraud against the plaintiff and states no facts from which fraud may be inferred. Want of authority to execute the bond, it was conceded, would be an answer to the action, but it was denied that a mere excess of authority by the directors would have that effect, unless it appeared that the plaintiff had knowledge of that fact, as the presumption would be, from what appeared on the face of the bond, that it was issued by lawful authority, and the court held that the plaintiff was entitled to recover, as he had advanced his money in good faith for the use of the company, giving credit to the representations of the directors that they had authority to execute the instrument. Dissatisfied with the judgment the defendant brought a writ of error in the Exchequer Chamber, where the case was reargued, but the Court of Errors unanimously affirmed the judgment.‡

Viewed in any reasonable light the court is of the opinion that the plaintiff is an innocent holder for value, and that the loss, even if the supervisor failed in his duty to his con-

---

* Supervisors *v.* Schenck, 5 Wallace, 783.   † 5 Ellis & Blackburne, 259.
‡ Same Case, 6 Ellis & Blackburne, 331.

stituents, cannot be cast upon the *bonâ fide* creditors of the township.*

JUDGMENT AFFIRMED.

Mr. Justice MILLER and Mr. Justice FIELD did not sit in this case.

---

* Maclae v. Sutherland, 25 English Law and Equity, 114.