"Wright, J.
An alternative writ of mandamus having been issued, a peremptory one is now asked for the purpose of compelling the board of education to apply certain moneys in their treasury, levied for that purpose, to the payment of bonds issued, and also to levy such tax as may be necessary to pay the balance of such bonds, after the amount in the treasury shall have been exhausted.
The answer to the alternative writ avers that these bonds are illegal and invalid, and that their payment, therefore, can not be enforced.
Power to issue such bonds appears to have been given by the law of March 13,1868 (S. & S. 710 ; 65 Ohio L. 24), upon the conditions therein prescribed. There is much dispute whether or not these conditions were complied with, it being ui’ged by the defendants that the board of education did not act in pursuance of the authority conferred by law. This may be true, and still the bonds be valid in the hands of an innocent holder for value. If power to issue were conferred, however irregular may have been the steps taken *97 in the attempt to exercise that power, the bonds can not be declared void in such a proceeding as this. It is not unlike jurisdiction in a court. If the jurisdiction to do a certain act was really conferred by law, although the proceedings may have been erroneous, they can not be collaterally impeached.
Having power to issue, the board did in fact issue the bonds. 'Whether all requirements of the statute were fully met, we can not now inquire to the detriment of those who bought in good faith. Upon the face of the obligations, they are stated to be “ under .the act of the general assembly of the State of Ohio, passed March 13, 1868, entitled an ‘ act supplementary to an act passed March 18,1864/ ” etc.
When a municipal, or other authority, having the power, proceeds to exercise it, and sends into the market bonds upon which the affirmation appears that they are under and in pursuance of a given law, that affirmation, can not afterward be denied, as against holders who have paid their money upon the faith of it. Without going into an extended examination of authorities to establish this proposition, we deem it sufficient to refer to 1 Dillon Mun. Corp. 307, sec. 416c et seq; Comm’rs Knox Co. v. Aspinwall, 21 How. 539; St. Joseph Township v. Rogers, 16 Wall. 644.
It is also claimed that there was no occasion for issuing these bonds at all; that levies had been provided which would have met all the requirements of the building contracts made by the board of education, for the payment of which the bonds were prepared. There is much force in this claim, and if proceedings had been promptly instituted before the bonds had been negotiated, quite serious questions might have arisen. But we think it too late to raise that objection now. Discretion when and under what circumstances to issue, must, in the nature of things, be reposed somewhere.. The legislature have seen fit to repose it in the board of education. It is a discretion judicial in character and can not be revised by courts, except under *98 extraordinary circumstances, if at all. ■ Clearly it can not be done after the bonds have gone into the market, and been sold for value.
It is further said by defendants, that the bonds are invalid, having been sold by the board of education for less than par, which is directly in the teeth of the statute providing for the issue. This whole issue, of which relator holds but a part, was $8,000, and does appear to have been sold to the original purchaser from the board for less than par. If the original purchaser were now before the court, seeking a mandamus, or any other remedy to enforce payment, his right would certainly not be clear. But we are not prepared to say that- the bonds, though void in the hands of one who thus illegally bought from the board, are also void in the hands of one who innocently bought them subsequently, even though from the original purchaser. The reason for this is obvious. To obligations of this nature, some of the characteristics of negotiable paper attach. It is desirable that this should be so. Defenses, therefore, which might be sufficient as between the original parties to such instruments, may entirely fail when they have passed into the hands of holders who are innocent and. ignorant.
The question then arises, Is the relator a bona fide holder, and has he paid his money ?
There is an atmosphere enveloping the transactions in which these bonds originated, which does not commend these transactions, nor the actors in them, to the favorable consideration of the court.
If Robertson were complicated herein, the taint might be such that he would fail in this proceeding. But he appears to have been innocent of wrong-doing, and if he bought the bonds, not from the board, but from another - to whom the board had already sold, then it matters not if he did buy at less than par.
It is clear that he purchased at ninety cents, and paid the money. He says he thought he was buying of the board, -because he bought of Hunt, who was its secretary. But his mistaken belief that he was buying of the board should *99 not invalidate the bonds in his hands, if in point of fact they had already been sold to another, from whom the relator himself bought. It appears that the bonds had been sold by the board to Peck, the negotiation having been completed before they were issued. On the 30th of June, 1868, Peck made his proposition of purchase, with the doubtful surroundings to which we have already alluded. The proposition was accepted the same day it was made. The proposition and acceptance certainly must constitute a contract of sale, if the bonds were subsequently issued and paid for. The bonds were issued July 14th, and the treasurer ordered to transfer them to Peck, he paying the money for them. The treasurer says Peck did pay for them in vouchers, which to the board was the same thing as money. The secretary says Peck bought them, and “ signed the stub for them.” It is perhaps not as clear as might be desired,, when Peck turned over his vouchers in payment, still it may be fairly inferred that it was on or about this date of July 14th. The bonds were issued at that date. The vouchers Peckbought were issued at that date, and there was no reason why the exchange should not be made at once— the board to pay their debts, Peek to get his pay. There is nothing to show that there was an actual manual delivery of the bonds to Peck. They were in the possession of Hunt, who was both secretary of the board and Peck’s partner. While they belonged to the board the possession of Hunt, as secretary, was the possession of the board. When they were sold to Peck, the possession of Hunt, the partner, was the possession of Peck as completely as though they had been delivered to him.
While in this position, the relator negotiates with Hunt for his purchase. It is not strange if he did think that he was negotiating with the board, when negotiating with its secretary. But it is equally true that he might have been dealing with Hunt the partner, instead of Hunt the secretary. The validity of the sale depends not upon what was relator’s belief, but what was the fact. If the bonds had really been sold to Peck, and belonged to him, certainly *100 relator must have bought of him. The fact that they were in the custody of an officer - of the board, does not make them the property of the board.
¥e have seen that Peck bought probably in July, 1868. The time of relator’s purchase does not seem clearly ascertained. He first says : “ I bought them about the time they bear date.” Their date was the 1st of July, although not issued until the 14th. lie afterward says he first spoke to Hunt about them “ about the end of August, 1868.”
Andrew Roach, treasurer, says that Peck received the bonds and paid the men the money on their vouchers, which were turned over to the couhty order in settlement.
The secretary, Hunt, testifies that relator bought the bonds of Peck “ either in the latter part of August or September, a. d. 1868. It was from four to eight weeks after they had been negotiated to Peck.”
The evidence, therefore, leads us to the conclusion that Peck had bought the bonds of the board in July, 1868, paying for them in vouchers for work done on the school buildings. That the circumstances surrounding the building contracts and the issue of the bonds, connected with the fact that Peek bought them below par, make such a case that in his hands we might at least say that his right was doubtful. But we are further constrained to believe that the evidence fails to show the complicity of relator with these events. It seems to us that he bought the bonds ignorant of any taint upon them; that he bought them of a party representing the owner, whoever he was, and that Peck was then the owner.
It might here be noticed that in defendant’s answer, the stress of defense is laid upon the fact that the bonds “ were not issued in pursuance of authority conferred upon said board by virtue of the act in said wxit referred to, or in pursuance of the vote of a majority of the qualified electox’s,” etc. It then proceeds to say that proper meetings of said electors wex’e not held, and px’oper votes not had ; in other words, resting the defense upon want of authority in law to issue these obligations.
*101 In the view we take of the case, the main point is, whether the bonds were sold by the board to the present holder at less than par. or whether he was so complicated with the one who did purchase for less than par, as to make him responsible therefor. Tet it is nowhere averred in any part of the answer that Robertson, the relator, bought for less than par, nor that any one else did, and for all that appears in that pleading, which should set forth all defenses, this question is not raised, or even alluded to.
It is claimed in the brief of the learned counsel that relator is particeps criminis with Peck & Co. It is not so claimed in the answer, although it is averred in the alternative writ that “ Robertson, in the usual course of business, and in good faith, without any notice of any infirmity therein, and for a valuable consideration, bought a number of said bonds.” As to this, the answer says :
“ That the respondent has no knowledge, save as it is informed by said writ, whether said relator is the holder or owner of the bonds in said writ mentioned, or any of them, or whether he purchased the same, or any part thereof, in good faith, without notice of any infirmity therein, or for a valuable consideration, or whether any other of said bonds are now outstanding unpaid, in the hands of bona fide purchasers for value, and it therefore denies all statements in said writ having reference thereto.”
It might also be noticed that one of the counsel who prepared defendant’s answer testifies in the cause, and although the transactions of Peck, Lees, Hunt, and Thornton were, more or less, matters of public interest and controversy in Perrysburg township, this witness does not, in any sort, pretend to impugn the integrity of relator in the premises. In his own testimony, relator avers and insists upon, to the fullest extent, his innocence, his good faith, and his entire absence of any and all knowledge or suspicion of any irregularity, fraud, or taint, in reference to the bonds. He is examined, and cross-examined, and re-examined upon several occasions, and nothing is shown to implicate him. Indeed, the line of examination, upon either hand, does *102 not seem to be predicated upon the idea that Robertson knew of the matters mostly complained of, or was in any wise connected with them. If it be true, therefore, that the relator is indeed innocent, we Relieve he should have relief. Nearly, if not quite, all of the bonds have been paid — some to relator — and all paid by the consent of Perrysburg township, given in a suit to enjoin such payment; and though we do not say that these payments estop the township against any right of denial, the fact that they were made does not strengthen the- case of the township, nor add to the reasons for depriving the relator of any just rights he might otherwise have.
Believing, then, that the relator is an innocent purchaser from Peck, he is entitled to relief, if mandamus be the proper remedy.
The writ of mandamus may be issued “ to compel the performance of an act which the law specially enjoins as a duty resulting from' an office, trust, or station.” Code, sec. 569.
It “ may not be issued in any case where there is a plain and adequate remedy in the ordinary course of law.” C., W. & Z. R. R. Co. v. Comm’rs Clinton County, 1 Ohio St. 77, 105.
The party must have a clear legal right. High’s Ex. Rem., p. 11, par. 9; p. 13, par. 10.
The relator has such clear legal right, if our deduction from the facts be the true one. He has bought his bonds, without any knowledge of infirmity in them. He bought them, not of the board of education, but of another party, and we think his right, therefore, is complete.
Has the relator any “ plain, adequate remedy in the ordinary course of law?” This proposition divides itself into two branches: First. Can the board of education be compelled by mandamus to levy a tax to pay the bonds, if there is not already sufficient funds in the treasuiy for that purpose from previous levies? "We conceive there can not be much doubt here. Mandamus is repeatedly allowed, for just this purpose. C., W. & Z. R. R. Co. v. Comm’rs Clinton. County, supra; State v. Van Horne, 7 Ohio St. 327; State v. Comm’rs Clinton County, 6 Ohio St. 280.
*103 The second branch of the proposition is, Can a mandamus issue to compel the board to pay the bonds, if the money is already in their treasury ? Here, it may be said the relator may have his remedy at law. He may sue the board, and recover judgment. The action, if brought, must be upon the bonds. They provide that they are “ payable ... . out of the funds of said school district. In an ordinary civil, action, could a judgment be rendered which should be “ payable out of the funds of said school district?”
If the ordinary judgment were rendered, the anomaly would be presented - of the legal pursuit by a creditor of money owing by the board, which had already been raised by taxation, and was in the treasury, but by the official delinquency of somebody, the creditor is denied his rights. It is to remedy the consequences arising from just such official delinquency that the writ of mandamus issues. It was issued in State v. Treasurer of Wood Co., 17 Ohio, 184, a case very like this. The tax had been assessed, the money collected, and was in the treasury, and the writ compelled its payment. See also Cass Township v. Dillon, 16 Ohio St. 38.
The board of education has but limited corporate powers. It has power to issue these bonds only under the statute, and can pay them only as therein provided by a tax for the specific purpose. They could not pay them out. of any other fund, nor even out of their general fund. In case of judgment rendered, it might therefore be necessary to enforce its payment by mandamus. This we think can be done, when the right is clear, without such unnecessary suit at law.
The limited power of theseboards is considered in Board Education Brown Tp. v. Cheney, 5 Ohio St. 67.

Peremptory writ awarded.

Whitman and Johnson, JJ., concurred. Scott, Chief Judge, and Day, J., dissented from the judgment, believing the facts did not warrant it.