## UNITED STATES v. RAILWAY EMPLOYEES' DEPARTMENT OF THE AMERICAN FEDERATION OF LABOR et al.

(District Court, N. D. Illinois, E. D.   July 12, 1923.)

No. 2943.

1. **Injunction ⬤⟶101(3)—United States held entitled to permanent injunction against acts of strikers interfering with interstate commerce.**

Violence and lawlessness, accompanying strike of railway shop men and seriously interfering with interstate commerce, *held* to entitle the United States to a permanent injunction in a suit brought to restrain and enjoin unlawful combination and conspiracy to interfere with interstate commerce.

2. **Injunction ⬤⟶101(1)—Purpose of strike held unlawful, and carrying out not permissible by means otherwise legal.**

Where purpose of strike of railway shop men was to cripple and destroy interstate commerce, and thereby create public opinion, hostile to decision of Railway Labor Board, concerning wages, such purpose was unlawful, and might not be carried out by means that otherwise would be legal.

3. **Injunction ⬤⟶189—When purpose of strikers was to carry out strike by assaults and violence, injunction will not be limited to acts of violence.**

Even if strike was mere controversy between employer and employees, where part of purpose of those engaged in it was to carry it on by assaults and violence, injunctive relief will not be limited to acts of violence, leaving defendants free to encourage injury to persons and property by words and deeds in themselves apparently peaceful and lawful.

4. **Injunction ⬤⟶101(3)—Peaceful words and exhortations may be enjoined, when transcending right of free speech, because of atmosphere in which spoken.**

When peaceful words of strikers and pickets and peaceful exhortations of strike leaders take on, by virtue of atmosphere of lawlessness and violence in which spoken, a force not inhering in the words themselves, and therefore transcending any possible right of free speech, they may be enjoined.

In Equity.   Suit by the United States against the Railway Employees' Department of the American Federation of Labor and others.   On final hearing.   Decree granting permanent injunction.

Suit brought by the United States of America under the act entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890 (26 Stat. 209 [Comp. St. § 8820 et seq.]), to restrain and enjoin the defendants, as an unlawful combination and conspiracy to interfere with, hinder, obstruct, and restrain interstate trade and commerce and the carriage of the United States mail upon and over the lines of railroad and systems of transportation of the United States.   Preliminary injunction granted September 23, 1922.   See United States v. Railway Employees (D. C.) 283 Fed. 479.   Motion to dissolve preliminary injunction and to dismiss the bill of complaint denied.   See United States v. Railway Employees (D. C.) 286 Fed. 228.

H. M. Daugherty, Atty. Gen., Blackburn Esterline, Asst. Sol. Gen., of Washington, D. C., Jacob M. Dickinson, Orville J. Taylor, Jr., Sp. Asst. Attys. Gen., and Edwin A. Olson, U. S. Atty., all of Chicago, Ill.

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Donald R. Richberg, of Chicago, Ill., Frank L. Mulholland, of Toledo, Ohio, and James S. Easby-Smith, of Washington, D. C., for defendants.[1]

WILKERSON, District Judge. This is a suit brought by the United States under the general equity jurisdiction of the District Court, and under the Anti-Trust Act of July 2, 1890 (26 Stat. 209), to restrain and enjoin the defendants, as an unlawful combination and conspiracy to obstruct and restrain interstate trade and commerce and the carriage of the United States mails upon and over the lines and systems of railroad transportation in the United States. The substance of the bill is set out in the opinion filed upon the granting of the temporary injunction. 283 Fed. 479. The substance of the answer is stated in the decision overruling defendants' motion to dissolve the temporary injunction and to dismiss the bill. 296 Fed. 228. The questions of law involved are dealt with in those opinions, and upon a reexamination of those questions I find no reason to modify the views there expressed. The defendants could have had the decision of the reviewing court upon their legal contentions by appeal from either the order granting the temporary injunction, or from the one refusing to dissolve it. This they did not see fit to do.

Pursuant to the order of January 5, 1923, depositions of more than 500 witnesses were taken in Memphis, Nashville, St. Louis, Los Angeles, San Francisco, Denver, Pittsburgh, and New York. Defendants were represented by their counsel at the taking of this testimony, which occupied much of the time between the 5th of January and the 2d of May, the date fixed for the trial. After all these depositions had been taken, and on the eve of the trial counsel for defendants, on May 1, 1923, withdrew their appearances and stated that defendants would not be represented at the final hearing. Complainant introduced additional evidence at the trial, defendants offered no evidence whatever in the case, and the case is now submitted for final decree.

The record consists of about 4,000 pages, besides many exhibits; 724 witnesses have testified. Included among these are witnesses from 50 interstate railroads, whose aggregate mileage is 190,242 miles. I shall not undertake to do more than outline the main points brought out in the proof. A digest of the evidence has been prepared by counsel for plaintiff at my request, and is filed as part of the record in this case. The evidence shows:

[1] On June 5, 1922, the Railroad Labor Board published its decision No. 10036, effective July 1, 1922, wherein it determined in accordance with section 307 of the Transportation Act of 1920 (41 Stat. 470), the justness and reasonableness of the wages and salaries of the members of the Federated Shop Crafts, defendants herein. The defendant organizations were dissatisfied with this order, and instituted the strike as a protest against the decision of the board, and for

---

[1] On the 1st day of May, 1923, the counsel for defendants in open court withdrew their appearances.

the purpose of either compelling the carriers to disregard the order, and accede to the demands of the unions, or coercing the board into modifying its order, so as to comply with the union demands. In the first bulletin issued at the outset of the strike by the organization leaders in charge of the strike, it was declared:

"The 'minute men' of organized labor in the American railroad industry quit their work en masse as the only recourse left after two years of negotiation and 'buck passing' on the part of the railroad managers, and a series of *injuries and usurpations* by the United States Railroad Labor Board." (Italics mine.)

I attached to the decision of January 5, 1923, on the motion to dissolve the injunction, extracts from bulletins issued from time to time during the strike. Those bulletins show the reponsibility of the officers of the defendant organizations for the management of the strike. They also show that those officers, in the midst of a campaign of violence unparalleled in American industrial history, were continuously inciting the members of defendant organizations to greater activity. The real purpose back of the strike is indicated in the following language from the bulletin of August 21, 1922:

"Rest assured that this strike has aroused the American people as no previous strike in the nation's history. They have visions of a fuelless and foodless winter, with the transportation system of the nation practically a derelict."

Immediately upon the inauguration of the strike, practically all of the terminal shops and roundhouses of the 50 railroads from which proof was taken were picketed. The conduct of the strikers and pickets was aggressive, belligerent, violent, and lawless. In order to keep men in the employ of these roads during the strike it was necessary, at practically all points, to construct bunkhouses and commissaries to house and feed the new employees on company properties. The 50 railroads from which proof has been taken housed and fed all employees on company property at 1,055 points scattered throughout the United States.

There was great damage both to persons and property during the strike. The evidence shows 19 deaths due to assaults and violence by strikers; 1,500 instances of various kinds of assaults by strikers on employees of the respective railroad companies and those seeking employment with them; 65 cases of kidnapping, with accompanying brutal assaults; 8 cases of tarring and feathering of new employees by strikers; 50 instances of burning and dynamiting, or attempting to burn and dynamite, bridges over which trains engaged in interstate commerce and carriage of the United States mails passed; 250 cases of burning or dynamiting, or attempting to burn or dynamite, property of the railroads and homes and property of the employees; 50 cases of derailments, or attempts to derail or wreck trains engaged in interstate commerce by greasing tracks, placing obstructions on tracks, removing spikes, interfering with frogs and switches, cutting wires, signal apparatus, etc. The cutting of air hose, throwing of stones, firing of shots, placing foreign substances, such as blue vitriol, gaskets, soap, and slugs in pipes, cylinders, and other parts of locomotives,

tampering with electrical equipment, removal of cotter pins and other necessary parts of locomotives, and placing of emery, sand, and other foreign substances in journal boxes, occurred so generally and frequently throughout the country, on all railroads from which proof was taken, that it is impossible to compile the exact number of such cases.

As to the damage inflicted upon the railroads by the strike, the evidence shows that the total cost of the strike on the 50 railroads from which testimony was adduced, amounted to more than $96,000,000. This represents only money actually paid out on account of the strike, and does not include damages to property, loss of business incurred, increased cost of doing business, nor loss by claims for damages. The total cost to the Department of Justice of the United States for additional United States deputies and expenses, as evidenced by the certificate of the Attorney General, amounted to almost $2,000,000. The 50 railroads from which proof was taken had in their employ on the 1st of July, 1922, prior to the strike order becoming effective, approximately 277,000 shopmen. Of this number, more than 90 per cent. in every instance responded to the strike call. In some cases, the number of those answering the call was as high as 98 per cent.

The general effect of the strike on the performance and operations of the fifty railroads from which testimony was adduced, was to increase delays of freight, passenger, and mail service approximately 50 per cent. The general effect of the strike on the motive power of the 50 railroads from which proof was furnished was to bring about a general breakdown and deterioration of motive power, resulting in the consumption of such surplus motive power as those railroads had on the 1st of July, 1922, and in the inability on the part of most of those roads to perform any back shop repairs during the early months of the strike, and in limiting repairs from then on.

The general effect of the strike on business and industry of the country, as evidenced by the testimony of 53 representatives of leading business concerns of the country, was a general disturbance, slowing down of production, reduction of volume, loss of customers, and monetary losses due to delays on the part of business houses in receiving and obtaining raw materials, and in shipping and transporting finished products. The effect of the strike on the United States Postal Department, as evidenced by the certificate of the Postmaster General, was the discontinuance of 706 trains carrying United States mail, operating over a total of 39,716 miles. As a result of this, 462 United States post offices, serving a population of 352,671 people, were without mail service.

On account of the belligerent, violent, and lawless conduct and demeanor of pickets and strikers, the 50 railroads from which proof was taken employed during the period of strike a maximum at one time of 53,831 additional guards and police officers for the protection of their respective properties and employees. As additional police protection, United States marshals, militia, and state constabularies were required. The evidence further shows that at the time of the final hearing in May, 1923, while the violence of the strike had sub-

sided, it was actually in force and pending against 62 per cent. of all the railroads in the United States engaged in interstate commerce, representing a mileage of 140,316 miles.

After the granting of the temporary injunction, the acts of violence, assault, and malicious injury diminished in number, and the evidence clearly indicates that a continuance of the injunction is necessary in order to prevent in certain localities fresh outbursts of lawlessness and a recurrence of the depredations committed in 1922. It seems almost incredible that warfare of the kind disclosed by the voluminous record in this case should have been waged in this country. It is even more ominous that this unlawful assault upon the commerce of the nation should have found apologists and defenders, including some. (happily a few, however) of those charged with the duty of protecting property and enforcing the law.

The complainant is entitled to a decree making permanent the provisions of the temporary injunction heretofore granted. The evidence clearly establishes the unlawfulness of the purpose of the combination shown to have been entered into by the defendants. While the decisions of the Labor Board are not to be enforced by process, they do have for their sanction, as pointed out by Mr. Chief Justice Taft (Pennsylvania R. R. Co. v. United States Railroad Labor Board et al., 43 Sup. Ct. 278, 67 L. Ed. ——, decided February 19, 1923), "the force of public opinion, invoked by the fairness of a full hearing, the intrinsic justice of the conclusion, strengthened by the official prestige of the board, and the full publication of the violation of such decision by any party to the proceeding."

[2] This strike was more than a controversy between employer and employee. Its manifest purpose, as shown by the evidence, was to cripple and destroy interstate commerce, and to create by this assault a public opinion hostile to the decision of the board. The primary purpose of the combination, therefore, is unlawful, and it may not be carried out by means that otherwise would be legal. Duplex Printing Press Co. v. Deering et al., 254 U. S. 443, 465, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196.

[3] Even if the strike is regarded merely as a controversy between employer and employee, the evidence shows beyond doubt that it was part of the purpose of those engaged in this combination to carry on the strike by assaults and acts of violence. Certainly upon such a showing the injunctive relief will not be limited to forbidding acts of violence which are done in secret, and for which it is hard to fix responsibility and to impose punishment, and thus leave defendants free to encourage injury to persons and property by open words and deeds which in themselves appear peaceful and lawful.

[4] But, passing the purpose of the conspiracy, it is a misnomer to characterize any of the acts of the defendants as "peaceful." The peaceful words of the strikers and pickets, the peaceful exhortations of the strike leaders, take on, by virtue of the atmosphere of lawlessness and violence in which they are spoken, a force not inhering in the words themselves, and therefore transcending any possible right of free speech. "Under such circumstances they become what have

been called 'verbal acts,' and as much subject to injunction as the use of any other force whereby property is unlawfully damaged." Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797. To undertake to throw around the so-called "peaceful" words of those engaged in this violent assault upon the commerce of the nation the protection of the doctrines of free speech and peaceable assembly is a perversion of those great constitutional guaranties. A decree with provisions the same as those contained in the temporary injunction is the least that can be granted to the complainant under the showing in this case.

Counsel for complainant have submitted a draft of a decree for a permanent injunction, whose provisions are the same in all substantial respects as those of the temporary injunction. That decree will be entered.