VIRGINIAN RY. CO. v. SYSTEM FEDERA-TION NO. 40, RAILWAY EMPLOYEES DE-PARTMENT OF THE AMERICAN FED-ERATION OF LABOR et al.

No. 4005.

Circuit Court of Appeals, Fourth Circuit.

June 18, 1936.

642

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

James Piper, of Baltimore, Md., and H. T. Hall, of Roanoke, Va. (W. H. T. Loyall, of Norfolk, Va., and John C. Donnally, of Washington, D. C., on the brief), for appellant.

Clarence M. Mulholland, of Toledo, Ohio, and S. M. Brandt, of Norfolk, Va. (Frank L. Mulholland, of Toledo, Ohio, on the brief), for appellees.

Leo F. Tierney, Sp. Asst. to the Atty. Gen. (John Dickinson, Asst. Atty. Gen., and Wendell Berge, Sp. Asst. to the Atty. Gen., and Robert L. Stern, Sp. Atty., of Washington, D. C., on the brief), for the United States, amicus curiæ.

PARKER, Circuit Judge.

On August 20, 1934, an election was conducted by the National Mediation Board among the employees of the mechanical department of the Virginian Railway to select a representative of these employees to act for them under the Railway Labor Act, as amended by the Act of June 21, 1934, 48 Stat. 1185, 45 U.S.C.A. § 151 et seq. At this election, System Federation No. 40 of the American Federation of Labor was the choice of the majority of those eligible to vote in four crafts, viz., the sheet metal workers, the machinists, the electrical workers and the boilermakers. It received a majority of the votes cast by the blacksmiths and by the carmen and coach cleaners, but not a majority of the eligible votes of those crafts. In the case of the blacksmiths, a majority of those eligible to vote participated in the election, but in the case of the carmen and coach cleaners this was not true. The Mediation Board, on September 13, 1934, certified under the statute that System Federation No. 40 had been chosen by all six of the crafts named to represent them for the purposes of col-

lective bargaining; and upon the refusal of the railway company to treat with or recognize the Federation as the representative of the employees in question, this suit was instituted, asking that the railway be required to treat with it as the representative of the employees and be enjoined from attempting to influence or interfere with the employees thereafter in their choice of representatives for the purpose of collective bargaining.

The judge below heard the case fully and carefully and correctly analyzed the evidence in his opinion reported in (D.C.) 11 F.Supp. 621, to which we refer as a sufficient statement of the facts. In holding the Federation entitled to the relief prayed, except as to the right to represent the carmen and coach cleaners, he made the following findings as to the determinative facts, viz.: (1) That the defendant is a common carrier by railroad engaged in interstate commerce; (2) that System Federation No. 40 is the duly authorized representative of the mechanical department employees of the defendant, except the carmen and coach cleaners, having been designated as such by the National Mediation Board, on September 13, 1934, in accordance with the provisions of the Railway Labor Act; (3) that the defendant, in violation of the provisions of that act, has failed to treat with System 40 as representative of employees who have chosen it as their representative; and (4) that, by means of personal interviews, posted bulletins, and the circulation of a pamphlet calling attention to the disadvantages of membership in a standard labor organization and the advantages of a company union, the defendant has sought to influence the employees of its mechanical department "against any participation in or association with a standard labor organization and thereby to maintain a mere nominal association or union supported wholly by the defendant", and that the defendant since the certification by the Mediation Board has "continued and doth now continue * * * to endeavor to deprive its mechanical department employees of any and all right to independent representation for the purpose of collective bargaining."

A careful study of the evidence convinces us that these findings are amply supported. It has been argued with much earnestness that the influence forbidden by the act is something in the nature of undue influence, reliance being placed upon expressions contained in the opinion in

Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U. S. 548, at page 568, 50 S.Ct. 427, 74 L.Ed. 1034, and that the circulation of the pamphlet, referred to as the Sasser statement, should not be condemned as constituting the exercise of such undue influence. It must be remembered in this connection, however, that any sort of influence exerted by an employer upon an employee, dependent upon his employment for means of livelihood, may very easily become undue, in that it will coerce the employee's will in favor of what the employer desires against his better judgment as to what is really in the best interest of himself and his fellow employees. One purpose of the Railway Labor Act, as amended, was to insure free and untrammeled action on the part of the employees in the choice of their representatives for the purpose of collective bargaining; and it is a violation of the terms, as well as of the spirit of the act, for the employer to address arguments to the employee couched in such terms, or presented in such manner, as to lead the employee to fear that he may suffer from the action of the employer if he does not follow the wishes of the latter in making his choice of representatives. Collective bargaining would be a delusion and a snare if the employer were permitted to exert pressure of any sort upon the employee with respect to a matter of this kind.

It is not necessary to decide here whether the Sasser statement, standing alone, would be sufficient to convict the railway of attempting to interfere with and unduly influence its employees in their choice of representatives, as we think that the other evidence, when considered in connection with that statement, is sufficient to support the finding of the trial judge in that regard. There can be no question, therefore, but that, granting the constitutionality of the Railway Labor Act, the portion of the decree enjoining the railway from interfering with the employees in the choice of representatives should be affirmed, unless there is something in the Norris-LaGuardia Act of March 23, 1932, 47 Stat. 70, 29 U. S.C.A. § 101 et seq., which forbids the granting of such an injunction. Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, supra. We agree with the trial judge that that act does not forbid the granting of an injunction under the circumstances here appearing. As was well said by him: "Does the evidence present a case which meets the requirements of

that act? It seems to me that this question must be answered in the affirmative. The Railway, acting through its officers and agents, has persistently interfered with the shop craft employees in their efforts to organize for the purpose of collective bargaining, one of the principal objects if not the dominant object of the Railway Labor Act. This unlawful interference and purpose to influence its employees has been evidenced chiefly through activities of the Railway in creating and promoting so-called independent organizations, both before and since the election and by its fixed determination not to recognize or treat with the chosen representatives of the crafts unless they come from an organization under its control. In addition, I hardly think that any one can read with an open mind the Sasser statement referred to and quoted at length above without fairly concluding that it was printed and circulated to 'use the authority and power' of the Railway 'to induce action' by the members of the craft 'in derogation of what the statute calls "self organization."' That it probably and naturally had the intended effect on many of those to whom it was delivered is no more than a reasonable inference to be drawn from the situation and power of the author over those to whom it was addressed. It is likewise clear that similar acts will be continued in the future to defeat or seriously interfere with self-organization and representation unless prohibited. The right of self-organization and representation in the matter of rates of pay, hours of labor, and working conditions is a property right, the loss of which would result in irreparable damage to complainants. Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, supra. Complainants have no adequate remedy at law to enforce that right, greater injury will undoubtedly be inflicted upon them by denial than upon defendant by the granting of relief, and the controversy is not a matter with which local public officials can deal. It involves rights granted by an act of Congress and local public officials are without authority or power to protect or enforce such rights. Myers v. Louisiana & A. Ry. Co. (D.C.) 7 F.Supp. 92; [Id. (D.C.) 7 F.Supp.] 97."

This leaves four questions for our consideration: (1) Whether the mandatory feature of the decree is warranted by the statute and not forbidden by the Norris-LaGuardia Act; (2) whether the statute is a valid exercise of the power of Congress to regulate interstate commerce (Const. art. 1, § 8); (3) whether the statute is constitutional when tested by the due process clause of the Fifth Amendment; and (4) whether a majority of the votes cast in a craft election is sufficient for the choice of a representative for collective bargaining, or whether a majority of those eligible to vote is required. We shall consider these in the order named.

## 1. The Question as to the Mandatory Injunction.

It is argued that the Railway Labor Act does not require agreement upon the terms of any contract, and that in providing merely that the carrier shall treat with the representatives it does not prescribe any duty enforceable in the courts. It is true that the act does not require agreement between the carrier and the representative of its employees; but the whole purpose of the act is to set up machinery for the settlement of disputes by which disagreements resulting in strikes may be avoided, and it is essential to the working of this machinery that the carrier treat with the representative of the employees as contemplated by the act. Thus, it is provided by section 2 (second) thereof (48 Stat. 1187, 45 U.S.C.A. § 152 (second) that all disputes between a carrier and its employees shall be considered, and, if possible, decided in conference between representatives designated and authorized to confer. It is provided by section 2 (sixth) (48 Stat. 1188, 45 U.S.C.A. § 152 (sixth) that, in case of a dispute arising out of grievances or the interpretation or application of agreements, it shall be the duty of the representatives of the carrier and of the employees, within 10 days after the receipt of notice of a desire on the part of either party to confer with respect to such dispute, to fix a time and place for a conference. Section 6 (48 Stat. 1197, 45 U.S.C.A. § 156) provides that carriers and representatives of employees shall give at least 30 days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and shall agree upon the time and place for the beginning of conference between representatives of the parties interested in such intended changes within 10 days after the receipt of the notice. Carriers are forbidden to change the rates of pay, rules, or working conditions as embodied in agreements without giving the 30-day notice just referred to,

except in cases where the agreements themselves provide for the change. 48 Stat. 1188, 45 U.S.C.A. § 152 (seventh).

If the conferences thus provided for do not result in the settlement of disputes, the act has other provisions for their settlement which require action on the part of the representatives of the parties. Thus, either of the parties, which in the case of the employees means their representatives, may invoke the services of the Mediation Board if a dispute is not adjusted in conference, and there is provision for the preservation of the status quo for a 30-day period in case the Mediation Board shall fail in bringing the parties to agreement or in securing an arbitration of grievances. 48 Stat. 1195, 45 U.S.C.A. § 155. In case of agreement to arbitrate, the representative of the employees is to select one of the arbitrators if of a board of three, or two if of a board of six; and such representative is to sign the agreement to arbitrate in behalf of the employees. 44 Stat. 582 and 584, 48 Stat. 1197, 45 U.S.C.A. §§ 157 and 158. Questions submitted to arbitration are to be withdrawn upon notice in writing signed by the representatives of the parties. 44 Stat. 584, 45 U.S.C.A. § 158 (f). And the entire submission to arbitration may be revoked by agreement signed by their representatives. 44 Stat. 585, 45 U.S.C.A. § 158. An award of a board of arbitration constituted under the act is to be filed in the office of the clerk of the federal District Court; and, unless the award is impeached as provided in the act, the court is required to enter judgment thereon which shall be final and binding on the parties. 44 Stat. 585, 45 U.S.C.A. § 159.

It is clear that all of these provisions, so carefully made for the settlement of disputes which might lead to strikes and industrial warfare, would amount to nothing if the carrier should refuse to recognize or treat with the representatives of its employees; and it was to guard against just this contingency, that it was provided by the first and second sentences of section 2 (ninth) of the Act of June 21, 1934 (48 Stat. 1188, 45 U.S.C.A. § 152 (ninth): "If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this Act [chapter], it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier *shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act* [chapter]." (Italics ours.)

The history of the Railway Labor Act shows that it was the purpose of Congress by the use of this language to impose a binding duty upon the carrier to recognize and treat with the representatives of the employees as certified by the Mediation Board. The Transportation Act of 1920, 41 Stat. 456, provided merely that the carriers and their employees should exert every reasonable effort to avoid interruption to the business of the carriers growing out of disputes with their employees, with provision that the parties should endeavor to settle such disputes and, if unable to do so, should refer them for arbitration to the appropriate board set up under the Act. 41 Stat. 469, § 301, 45 U.S.C.A. § 132. And the Supreme Court decided that the courts were without power to enforce this provision of the act, which depended for its force upon the moral sanction of public opinion, saying: "The statute does not require the railway company to recognize or to deal with or confer with labor unions. It does not require employees to deal with their employers through their fellow employees. But we think it does vest the Labor Board with power to decide how such representatives ought to be chosen with a view to securing a satisfactory cooperation and leaves it to the two sides to accept or reject the decision." Pennsylvania R. Co. v. United States Railroad Labor Board, 261 U.S. 72, 84, 85, 43 S.Ct. 278, 283, 67 L.Ed. 536; Pennsylvania, etc., Federation v. Pennsylvania R. Co., 267 U. S. 203, 45 S.Ct. 307, 69 L.Ed. 574; Malone v. Gardner (C.C.A.4th) 62 F.(2d) 15.

The Railway Labor Act of 1926, 44 Stat. 577, created certain definite legal obligations enforceable by judicial proceedings for the purpose, among other things, of safeguarding the rights of the employees to bargain collectively through representatives of their own choosing without interference on the part of the carrier. Texas & N. O. R. Co. v. Brotherhood of

Railway & S. S. Clerks, 281 U.S. 548, 569, 50 S.Ct. 427, 74 L.Ed. 1034. It did not, however, provide the machinery necessary for determining the representatives of the employees or for requiring the carriers to recognize and deal with such representatives; and the Act of June 21, 1934, 48 Stat. 1185, 45 U.S.C.A. § 151 et seq., amending the Railway Labor Act, was passed for the purpose of remedying this defect. As said in the report of the House Committee:

"The bill does not introduce any new principles into the existing Railway Labor Act, but it is designed to amend that act in order to correct the defects which have become evident as a result of 8 years experience. * * *

"The Railway Labor Act of 1926, now in effect, provides that representatives of the employees, for the purpose of collective bargaining, shall be selected without interference, influence, or coercion by railway management, but it does not provide the machinery necessary to determine who are to be such representatives. These rights of the employees under the present act are denied by railway managements by their disputing the authority of the freely chosen representatives of the employees to represent them. A considerable number of railway managements maintain company unions, under the control of the officers of the carriers, and pay the salary of the employees' representatives, a practice that is contrary to the purpose of the present Railway Labor Act, but it is difficult to prevent it because the act does not carry specific language in respect to that matter. This bill is designed to correct that defect."

We think it clear that the act of 1934 did more than express a pious hope on the part of Congress that the carriers would deal with the representatives which their employees might choose. In providing that "the carrier shall treat with the representative so certified [by the Mediation Board] as the representative of the craft or class for the purposes of this Act [chapter]" (45 U.S.C.A. § 152 (ninth), it created a legal right on the part of the employees to have the carrier recognize and treat with their chosen representatives for the purposes of collective bargaining and a corresponding duty on the part of the carrier to recognize and treat with such representatives, so that the purposes of the act might not be nullified by the carrier's refusing to recognize a representative select-ed by its employees and certified as such by the Mediation Board. And it is no objection to this view that the parties are not bound to agree even though they may treat. The representatives of the employees, as above pointed out, have important functions to perform under the act, which they can perform only if the railroad recognizes and treats with them as representing the employees; and while negotiation may not result in agreement, this is no reason why the carrier should arbitrarily refuse to negotiate with those whom its employees have chosen to represent them in negotiations. In collective bargaining, it may be that negotiation will not result in agreement, but it is certain that there will be no agreement without negotiation.

It requires no argument to demonstrate that an ignoring by the carrier of the representatives chosen by the employees and a refusal to treat with them would result in irreparable injury to the employees in defeating their right to collective bargaining through representatives of their own choosing as contemplated by the act (see Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, at page 571, 50 S.Ct. 427, 74 L.Ed. 1034); and the case is peculiarly one calling for the exercise of the power of the court to protect the rights of the employees and enforce the duty of the carrier by mandatory injunction, which is properly granted in the sound discretion of a court of equity to enforce a right for which no other remedy is available. Moor v. Texas & N. O. R. Co., 297 U.S. 101, 56 S.Ct. 372, 80 L.Ed. 509; Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901; In re Lennon, 166 U.S. 548, 17 S.Ct. 658, 661, 41 L.Ed. 1110; Simon v. Frankfort Distillery, Inc. (C.C.A. 6th) 2 F.(2d) 949; Loisel v. Mortimer (C.C.A.5th) 277 F. 882, 886; Western Union Tel. Co. v. Postal Telegraph Co. (C.C.A. 9th) 217 F. 533, 539; Southern California Ry. Co. v. Rutherford (C.C.) 62 F. 796, 797; Parsons v. Marye (C.C.) 23 F. 113, 121; Wells, Fargo & Co. v. Northern Pac. Ry. Co. (C.C.) 23 F. 469, 480, 481; Myers v. Louisiana & A. Ry. Co. (D.C.) 7 F. Supp. 92; Id. (D.C.) 7 F.Supp. 97.

In the case of In re Lennon, supra, an injunction was issued the effect of which was to require one railroad to receive freight cars from another without discrimination. The Supreme Court, in approving the injunction, said: "Perhaps, to a certain extent, the injunction may be term-

ed mandatory, although its object was to continue the existing state of things, and to prevent an arbitrary breaking off of the current business connections between the roads. But it was clearly not beyond the power of a court of equity, which is not always limited to the restraint of a contemplated or threatened action, but may even require affirmative action, where the circumstances of the case demand it. Robinson v. Lord Byron, 1 Bro.C.C. 588; Hervey v. Smith, 1 Kay & J. 389; Beadel v. Perry, L.R. 3 Eq. 465; Whitecar v. Michenor, 37 N.J.Eq. 6; Broome v. New York & New Jersey Telephone Co., 42 N.J.Eq. 141, 7 A. 851."

It is argued that the power to grant a mandatory injunction in a labor dispute is denied to the court by section 9 of the Norris-LaGuardia Act, 47 Stat. 70, 72, 29 U.S.C.A. § 109, which provides: "And every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court as provided herein." We think it clear, however, that the purpose of this provision was not to forbid the granting of mandatory injunctions in the rare cases in which they are proper, but to limit the scope of all injunctions in labor cases to matters specifically alleged in the bill and supported in the findings of fact of the court. Statutes in derogation of the ordinary equity powers of the court should be strictly construed; and a provision manifestly intended to provide against blanket injunctions, of which complaint had been frequently made prior to the passage of the statute, should not be construed to deprive the court of the power to enforce by mandatory decree a right created by act of Congress.

### 2. Is the Statute a Valid Regulation of Interstate Commerce?

It is conceded that 97 per cent. of the business done by the defendant railway company is interstate in character; but 321 of the 824 mechanical department, or shop craft, employees are employed in the Princeton Shops of the defendant in what is known as "back shop" work, i. e., in the repair of locomotives and cars which are temporarily withdrawn from service for that purpose. It is the contention of the railway that these employees are not engaged in interstate commerce; and that, as the statute is expressly made applicable to them and to other employees defined as such in the orders of the Interstate Commerce Commission, it is invalid as an attempt by Congress to regulate matters affecting intrastate as distinguished from interstate commerce, and consequently beyond the scope of its powers. The railway relies for this position particularly upon the first Employers' Liability Cases, 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297, Shanks v. Delaware, L. & W. R. Co., 239 U.S. 556, 36 S.Ct. 188, 60 L.Ed. 436, L.R.A. 1916C, 797, and New York, New Haven & Hartford R. Co. v. Bezue, 284 U.S. 415, 52 S.Ct. 205, 76 L.Ed. 370, 77 A.L.R. 1370.

■ There is a difference, however, between what Congress may do to prescribe the measure of liability for injuries occurring in interstate commerce and what it may do to prevent the interruption of that commerce. The mining of coal, for example, is not interstate commerce even though the coal when mined is to be transported in or used in carrying on interstate commerce (Carter v. Carter Coal Co. et al., 56 S.Ct. 855, 80 L.Ed. ——) ; and one injured in such mining may not be protected by the Employers' Liability Act. Delaware, L. & W. R. Co. v. Yurkonis, 238 U.S. 439, 35 S.Ct. 902, 59 L.Ed. 1397; Spry v. Norfolk & W. R. Co. (C.C.A. 4th) 50 F.(2d) 598. But a conspiracy to interfere with its movement in interstate commerce is a proper subject of Congressional regulation. Coronado Coal Co. et al. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963. In the one case, the power of Congress is measured by what is necessary or proper for the regulation of the liability of the carrier to the employee in the carrying on of interstate commerce; in the other by what is necessary or proper to prevent interference with that commerce.

■ The purpose of the Railway Labor Act is to prevent the interruption of the business of an interstate carrier resulting from strikes and other industrial disturbances by providing for collective bargaining between such carrier and its employees and the settlement of labor disputes by agreement and arbitration. 47 Stat. 70, § 2, 29 U.S.C.A. § 102. For the machinery thus provided to be effective, it must apply to all of the employees of an interstate carrier; for not only would it not be practicable to establish separate organizations for bargaining among the employees engaged in interstate

commerce as distinguished from those who are not, but disturbances among the latter would inevitably disturb the interstate business of the carrier and would almost necessarily be communicated to the employees engaged in interstate transportation. The defendant, for example, employs machinists engaged strictly in interstate commerce as well as those who are employed in "back shop" work. It would be out of the question for it to bargain with the former and not with the latter; and, even if this were possible, a labor controversy with those involved in "back shop" work would be communicated to the others and a strike of the "back shop" workmen, if confined to them, would necessarily interfere with the carrying on of the interstate commerce in which the road is engaged. A typical case is presented, therefore, where Congress must regulate the relationship between the carrier and its employees not engaged directly in interstate transportation, as well as those who are so engaged, to regulate effectively the flow of interstate commerce over which it has plenary power and to prevent interference therewith. The rule applicable in such case was thus stated by the Chief Justice in the recent case of A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 544, 55 S.Ct. 837, 849, 79 L.Ed. 1570, 97 A.L.R. 947: "The power of Congress extends, not only to the regulation of transactions which are part of interstate commerce, but to the protection of that commerce from injury. It matters not that the injury may be due to the conduct of those engaged in intrastate operations. Thus, Congress may protect the safety of those employed in interstate transportation, 'no matter what may be the source of the dangers which threaten it.' Southern Ry. Co. v. United States, 222 U.S. 20, 27, 32 S.Ct. 2, 4, 56 L.Ed. 72. We said in Second Employers' Liability Cases, 223 U.S. 1, 51, 32 S.Ct. 169, 56 L. Ed. 327, 38 L.R.A.(N.S.) 44, that it is the 'effect upon interstate commerce,' not 'the source of the injury,' which is 'the criterion of congressional power.' We have held that, in dealing with common carriers engaged in both interstate and intrastate commerce, the dominant authority of Congress necessarily embraces the right to control their intrastate operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to secure the freedom of that traffic from interference or unjust discrimination and to promote the efficiency of the interstate service. Shreveport Case, 234 U.S. 342, 351, 352, 34 S.Ct. 833, 58 L.Ed. 1341; Railroad Commission of State of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 588, 42 S.Ct. 232, 66 L.Ed. 371, 22 A.L.R. 1086. And combinations and conspiracies to restrain interstate commerce, or to monopolize any part of it, are none the less within the reach of the Anti-Trust Act (15 U.S.C.A. § 1 et seq.) because the conspirators seek to attain their end by means of intrastate activities. Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 310, 45 S.Ct. 551, 69 L.Ed. 963; Bedford Cut Stone Co. v. Journeyman Stone Cutters' Ass'n, 274 U.S. 37, 46, 47 S. Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791."

The policy of regulating the relationship between interstate carriers and their employees, for the purpose of eliminating strikes and labor disturbances through collective bargaining, is in line with the policy of the government, developed as a matter of necessity, of dealing with such carriers, not by way of piecemeal restriction, but by way of regulation of the industry as a whole to the end that the country may be furnished an adequate transportation system. As said in the New England Divisions Case, 261 U.S. 184, 189, 190, 43 S.Ct. 270, 273, 67 L.Ed. 605, with respect to the Transportation Act of 1920, which contained the beginnings of the Railway Labor Act: "Transportation Act 1920, introduced into the federal legislation a new railroad policy. Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy R. Co., 257 U.S. 563, 585, 42 S.Ct. 232, 66 L.Ed. 371, 22 A.L.R. 1086. Theretofore, the effort of Congress had been directed mainly to the prevention of abuses, particularly those arising from excessive or discriminatory rates. The 1920 act sought to insure, also, adequate transportation service. That such was its purpose Congress did not leave to inference. The new purpose was expressed in unequivocal language. And, to attain it, new rights, new obligations, new machinery, were created. The new provisions took a wide range."

And in Dayton-Goose Creek Ry. Co. v. United States, 263 U.S. 456, 478, 44 S.Ct. 169, 172, 68 L.Ed. 388, 33 A.L.R. 472, the Supreme Court said, in sustaining the "recapture" provisions of the Transportation Act of 1920:

"In both cases [Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371, 22 A.

L.R. 1086; New England Divisions Case, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605] it was pointed out that the Transportation Act adds a new and important object to previous interstate commerce legislation which was designed primarily to prevent unreasonable or discriminatory rates against persons and localities. The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged.

"It was insisted in the two cases referred to, and it is insisted here, that the power to regulate interstate commerce is limited to the fixing of reasonable rates and the prevention of those which are discriminatory, and that when these objects are attained, the power of regulation is exhausted. This is too narrow a view of the commerce clause. To regulate in the sense intended is to foster, protect and control the commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety."

This broad view of the power of Congress over interstate carriers was but the carrying forward of doctrines laid down in earlier decisions. Thus in Baltimore & O. R. Co. v. Interstate Commerce Commission, 221 U.S. 612, 31 S.Ct. 621, 625, 55 L.Ed. 878, which dealt with the Hours of Service Act (45 U.S.C.A. §§ 61–64), the court upheld an act of Congress limiting the hours of labor of certain classes of employees of interstate carriers, even though it appeared that it was "utterly impracticable" for the carriers "to divide their employees in such manner that the duties of those who are engaged in connection with interstate commerce shall be confined to that com-

merce exclusively." In Southern Ry. Co. v. United States, 222 U.S. 20, 32 S.Ct. 2, 4, 56 L.Ed. 72, in upholding the Safety Appliance Act (45 U.S.C.A. § 1 et seq.) as applied to all cars used on an interstate railroad, the Supreme Court laid down a principle which clearly supports the exercise of power here involved. The court said: "We come, then, to the question whether these acts are within the power of Congress under the commerce clause of the Constitution, considering that they are not confined to vehicles used in moving interstate traffic, but embrace vehicles used in moving intrastate traffic. The answer to this question depends upon another, which is, *Is there a real or substantial relation or connection between what is required by these acts in respect of vehicles used in moving intrastate traffic, and the object which the acts obviously are designed to attain; namely, the safety of interstate commerce and of those who are employed in its movement?* Or, stating it in another way, Is there such a close or direct relation or connection between the two classes of traffic, when moving over the same railroad, as to make it certain that the safety of the interstate traffic and of those who are employed in its movement will be promoted in a real or substantial sense by applying the requirements of these acts to vehicles used in moving the traffic which is intrastate as well as to those used in moving that which is interstate? If the answer to this question, as doubly stated, be in the affirmative, then the principal question must be answered in the same way. And this is so, not because Congress possesses any power to regulate intrastate commerce as such, *but because its power to regulate interstate commerce is plenary, and competently may be exerted to secure the safety of the persons and property transported therein and of those who are employed in such transportation, no matter what may be the source of the dangers which threaten it. That is to say, it is no objection to such an exertion of this power that the dangers intended to be avoided arise, in whole or in part, out of matters connected with intrastate commerce.*" (Italics ours.)

In the Minnesota Rate Cases, 230 U.S. 352, 399, 33 S.Ct. 729, 739, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann.Cas.1916A, 18, the court further emphasized the power of Congress to regulate the affairs of interstate carriers with respect to matters affecting interstate commerce, notwithstanding the commingling of interstate and in-

trastate operations, saying: "The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the nation may deal with the internal concerns of the state, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere."

And in the Shreveport Case (Houston, E. & W. Texas Ry. Co. v. United States), 234 U.S. 342, 34 S.Ct. 833, 836, 58 L.Ed. 1341, the Supreme Court upheld an order of the Interstate Commerce Commission affecting intrastate rates, holding that Congress had power to regulate even the intrastate charges of a carrier when necessary to prevent interference with interstate commerce. The court said: "The fact that carriers are instruments of intrastate commerce, as well as of interstate commerce, does not derogate from the complete and paramount authority of Congress over the latter, or preclude the federal power from being exerted to prevent the intrastate operations of such carriers from being made a means of injury to that which has been confided to federal care. Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority, and the state, and not the Nation, would be supreme within the national field."

See, also, United States v. New York Central R. Co., 272 U.S. 457, 464, 47 S.Ct. 130, 71 L.Ed. 350.

The decisions from which we have quoted leave no doubt of the power of Congress to regulate those phases of a carrier's business which are purely intrastate in character if such regulation is necessary to the proper regulation and control of its interstate business. On the same principle it was held within the power of Congress to regulate the sale of livestock in stockyards, where the stockyards constituted public utilities to promote the flow of interstate commerce, even though many of the transactions subject to such regulation were intrastate in character. Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229. This case is of peculiar importance here for the regulatory statute was sustained in large part on the reasoning of Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, a prosecution under the Sherman Act (15 U.S.C.A. §§ 1–7, 15 note); the court holding: "If Congress could provide for punishment or restraint of such conspiracies after their formation through the Anti-Trust Law as in the Swift Case, certainly it may provide regulation to prevent their formation." Stafford v. Wallace, 258 U.S. 495, at page 520, 42 S.Ct. 397, 403, 66 L.Ed. 735, 23 A.L.R. 229. By identical reasoning, if labor disturbances of employees such as those who are involved here, warrant the exercise of injunctive power to prevent interference with interstate commerce, as was asserted by the defendant here in the shopmen's strike of 1922 and as was held in United States v. Railway Employees' Department (D.C.) 283 F. 479, and Id. (D.C.) 290 F. 978, certainly Congress can take appropriate steps to prevent such interference in advance of the disturbance. A statute providing for collective bargaining between interstate carriers and their employees is an appropriate means to this end; and it is no objection to such statute, in law or in reason, that some of the employees concerned in such bargaining may be engaged in the intrastate activities of the carrier.

So far as the question here under discussion is concerned, it is not at all different from that arising with respect to the Railway Labor Act of 1926 prior to its amendment, which was upheld against attack directed at its constitutionality in Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, supra, 281 U.S. 548, 570, 50 S.Ct. 427, 433, 74 L.Ed. 1034. While the precise constitutional point here discussed was not raised in that case, the court brushed aside all contention that the act was unconstitutional, saying: "We entertain no doubt of the constitutional authority of Congress to enact the prohibition. The power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement'

(The Daniel Ball, 10 Wall. 557, 564, 19 L. Ed. 999) ; to adopt measures 'to promote its growth and insure its safety' (County of Mobile v. Kimball, 102 U.S. 691, 696, 697, 26 L.Ed. 238) ; to 'foster, protect, control, and restrain' (Second Employers' Liability Cases, 223 U.S. 1, 47, 32 S.Ct. 169, 56 L. Ed. 327, 38 L.R.A.(N.S.) 44). *Exercising this authority, Congress may facilitate the amicable settlements of disputes which threaten the service of the necessary agencies of interstate transportation.* In shaping its legislation to this end, Congress was entitled to take cognizance of actual conditions and to address itself to practicable measures. The legality of collective action on the part of employees in order to safeguard their proper interests is not to be disputed. It has long been recognized that employees are entitled to organize for the purpose of securing the redress of grievances and to promote agreements with employers relating to rates of pay and conditions of work. American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 209, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360. Congress was not required to ignore this right of the employees but could safeguard it and seek to make their appropriate collective action an instrument of peace rather than of strife." (Italics ours.)

In the later case of Railroad Retirement Board v. Alton Railroad Co., 295 U.S. 330, 369, 55 S.Ct. 758, 771, 79 L.Ed. 1468, it was said in the majority opinion: "The railway labor act was upheld by this court upon the express ground that to facilitate the amicable settlement of disputes which threatened the service of the necessary agencies of interstate transportation tended to prevent interruptions of service and was therefore within the delegated power of regulation."

█ In view of what has been said, little consideration need be given to the argument that, since the act applies to employees of interstate carriers not engaged in interstate commerce, as well as to those so engaged, it must be declared void in toto as it is not possible to make a separation between the constitutional and unconstitutional features of the act. It is hard to imagine what class of employees of an interstate carrier might not present a danger of disturbance of its interstate business through strikes or other labor disturbances and thus afford a proper field for the application of the power of Congress. No such class is suggested, except the "back shop" employees before the court, as to whom we have seen that the suggestion cannot be entertained. If, however, there are such employees, it would seem, to use the language of the Chief Justice in the Railroad Retirement Case, 295 U.S. 330, at page 389, 55 S.Ct. 758, 779, 79 L.Ed. 1468, that: "In the administration of the act there would be ample opportunity to make all necessary distinctions between employees engaged in interstate commerce and any others who might be found to be otherwise exclusively employed, so as to exclude the latter from its benefits without impairing the general operation of the act."

The record in the Railroad Retirement Case shows that of over a million employees engaged in the service of the interstate carriers of the country, only 211,-107 are classified as not engaged in interstate transportation. Of these, 86,493 are "back shop," or maintenance of equipment employees, and 36,996 are auditing, accounting, and bookkeeping employees; and as pointed out by the Chief Justice (295 U.S. 330, at page 388, 55 S.Ct. 758, 779, 79 L.Ed. 1468), all of these "did have such relation to the activities of the carriers in interstate commerce as to bring them within the range of congressional power." This leaves less than 90,000 out of the more than a million employees of the interstate carriers who are not engaged in interstate commerce; and, even if these are not within the regulatory power of Congress, it is not thinkable that it could have been intended that the act should fail for that reason when it is expressly provided therein (44 Stat. 587, § 11) : "If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby."

Such employees would be outside the realm of federal power only on the ground that disputes and strikes on their part would not interfere with interstate commerce; and since the purpose of the act is to avoid such interference, its intention would not be in any way violated by excluding them from consideration in the administration of the act.

3. Questions Under the Fifth Amendment.

█ The validity of the Railway Labor Act, prior to its amendment by the act of

1934, was upheld by the Supreme Court, with special reference to the Fifth Amendment, in Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, supra; and we do not think that anything in the 1934 act conflicts with rights of property or freedom of contract as guaranteed by the due process clause of that amendment. The act does not require of the carrier the making of any agreement. It does not interfere with the normal exercise of the right of the carrier to select its employees or to discharge them. The requirement that the carrier recognize and treat with the chosen representatives of the employees is but an attempt to "facilitate the amicable settlements of disputes which threaten the service of the necessary agencies of interstate transportation," as approved by the Supreme Court in the Railway & S. S. Clerks Case.

It is argued that, as the carrier may refuse to contract with the representatives of the employees, it may refuse to treat with them with a view of contracting, and that, at all events, a requirement to treat is but a vain thing if treaty does not result in contract. As pointed out above, however, the representatives of the employees have many duties to perform under the act looking to the settlement of disputes and the avoidance of industrial conflict, other than the making of contracts; and it is important that their status be determined to the end that these duties may be properly performed, and that the carrier co-operate with them in performing such duties. We cannot see anything arbitrary or unreasonable in requiring that the carrier recognize the representatives of its employees and treat with them as such; and we do not understand on what theory the carrier can be said to be deprived of liberty or property by such requirement. It is but a reasonable regulation in aid of collective bargaining, which, as said by the Supreme Court, in the Railway & S. S. Clerks Case, Congress has chosen to promote as an instrument of industrial peace.

### 4. The Question as to Majority.

As there is no appeal from the action of the court in the case of the election held by the carmen and coach cleaners, we need not consider the effect of an election in which the majority of a craft does not participate, and we need not and do not decide whether a majority of the votes cast is sufficient for a choice in such case. In the case of the blacksmiths, where a majority of the craft participated in the election, we think that a majority of the votes cast was sufficient to determine a choice of representatives, even though these did not constitute a majority of all of those eligible to vote.

One of the purposes of the statutory provisions under consideration is to guarantee to the employees of interstate carriers the right of self government in matters relating to organization for collective bargaining. The act not only recognizes the right of employees to bargain collectively and safeguards their right to choose representatives for this purpose without interference or coercion from the employer, but also prescribes the principle of majority rule in the selection of such representatives, providing that: "The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this act [chapter]." 48 Stat. 1187, 45 U.S.C.A. § 152 (fourth). In case a dispute arises as to who are the representatives, it provides in a subsequent section (45 U.S.C.A. § 152 (ninth), 48 Stat. 1188) that the Mediation Board, upon the request of either party, shall investigate the dispute and certify the representatives authorized to represent the employees. For the purpose of discharging this duty, the Board is authorized to conduct an election by secret ballot to ascertain the employees' choice of representatives. The question is whether, in such an election, the choice is dependent upon a majority of all of those qualified to vote, or whether, in cases where a majority of those qualified to vote participate in the election, a majority of the votes cast is sufficient. We think that the latter is the rule to be applied.

If a majority of those qualified to vote is required, elections must frequently fail as a result of the failure of those qualified to vote to participate in them. If the employees are already represented, the failure to vote will be a vote against change; and where the employer, as in the case at bar, is opposed to change, the effect of the secret ballot will be in large measure nullified. In the case of the blacksmiths' election which is before us, for example, it appears that, of 46 members qualified to vote, 22 voted for the Federation, 8 for the Association, and 16 did not vote. If a majority of those qualified to vote be necessary to a choice in such election, the action of these 16 in not voting will be given the same effect as though they had voted

for the Association, the existing representative; and the fact that they had abstained from voting and thereby favored the plan of the employer would be known to him. If there had been no existing representative, the voting would have resulted in no representative being chosen, and the purposes for which the act was so carefully drawn, so far as this craft is concerned, would have been impossible of attainment.

■ We do not think the act should be given an interpretation leading to such results, if any other interpretation is possible (Sorrells v. United States, 287 U.S. 435, 446, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249); and we think that such other interpretation is not only possible, but is required by the language of the statute and by its reason and spirit. The clause of the act which we have quoted does not in terms require a majority vote of the craft. It merely prescribes the political principle of majority rule. Another section of the act provides the means of determining the majority, the political device of the secret election. Nothing is said as to whether the choice at such election shall be by a majority of the qualified voters, or merely by a majority of the votes cast; but the act clearly does not contemplate that there shall be such a failure of election as could easily result if the obtaining of a majority of the qualified voters were required. The universal rule as to elections of officers and representatives is that a majority of the votes cast elects, and that those not voting are presumed to acquiesce in the choice of the majority who do vote. Popular government would hardly be workable on any other basis. As was well said by Chief Justice Waite, speaking for the Supreme Court, in County of Cass v. Johnston, 95 U.S. 360, 369, 24 L.Ed. 416: "This we understand to be the established rule as to the effect of elections, in the absence of any statutory regulation to the contrary. All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares. Any other rule would be productive of the greatest inconvenience, and ought not to be adopted, unless the legislative will to that effect is clearly expressed."

For cases in which it is held that a majority of those voting is sufficient, see, also, St. Joseph Township v. Rogers, 16 Wall. 644, 21 L.Ed. 328; Carroll County v. Smith, 111 U.S. 556, 4 S.Ct. 539, 28 L.Ed. 517; Murdock v. Strange, 99 Md. 89, 57 A. 628, 3 Ann.Cas. 66; Louisville & N. R. Co. v. Davidson County Court, 1 Sneed (Tenn.) 637, 62 Am.Dec. 424 and note; Montgomery County Fiscal Court v. Trimble, 104 Ky. 629, 47 S.W. 773, 42 L.R.A. 738; Smith v. Proctor, 130 N.Y. 319, 29 N.E. 312, 14 L.R.A. 403; Oldknow v. Wainwright, 2 Burr. 1017 (per Mansfield, C. J.); Applequist v. Swedish Evangelical Lutheran Gethsemane Church, 154 Wash. 351, 356, 282 P. 224; First Baptist Church v. Ward (Tex. Civ.App.) 290 S.W. 828; 9 R.C.L. pp. 1115, 1116; and notes in 6 L.R.A. 308; 51 Am.St.Rep. 847; 13 Ann.Cas. 416. For cases holding that the general parliamentary rule that the majority vote of a quorum is sufficient, see United States v. Ballin, 144 U.S. 1, 12 S.Ct. 507, 36 L.Ed. 321; Missouri P. R. Co. v. Kansas, 248 U.S. 276, 39 S.Ct. 93, 63 L.Ed. 239, 2 A.L.R. 1589; In re Opinions of the Justices, 228 Ala. 140, 152 So. 901; Ladies of the Maccabees v. Hand, Com'r of Insurance, 235 Mich. 459, 209 N.W. 581. For cases holding that a majority of all the members of a commission or legislative body are necessary to a valid action, see State v. Gould, 31 Minn. 189, 17 N.W. 276; Chicago Rys. Co. v. Commerce Commission ex rel. C. M. C. Co., 336 Ill. 51, 167 N.E. 840, 67 A.L.R. 938; Wood v. Gordon, 58 W.Va. 321, 52 S.E. 261.

We see no reason why the act should not be interpreted as contemplating that this well-settled rule of elections should be applied in the case of the employees' election for which it provides, in cases like this where a majority of those qualified to vote participate in the election. Such a rule is fair and just to all parties. It gives every employee an opportunity to express his choice. It preserves the secrecy of elections. And it prevents the breaking down of the plan of collective bargaining which it was the purpose of the act to set up. The rule as applied by the judge below would, on the principles applicable to a quorum in legislative assemblies, limit the choice by the majority of those voting to cases where a majority of the qualified voters participate in the election. Without passing upon the validity of the limitation, we think that

there can be no question as to the validity of the choice where its conditions are complied with.

It is said that the act does not necessarily require an election of the representatives of the employees by secret ballot since paragraphs 3 and 4 of section 2 of the act, as amended, 45 U.S.C.A. Sup. § 152, pars. 3, 4, merely provide that representatives of the respective parties (employer and employees) shall be designated without interference, influence, or coercion by either party over the other; and that the employees shall have the right to organize and bargain through representatives of their own choosing, no method of choice being prescribed, the only provision being that "the majority of any craft or class of employees shall have the right to determine who shall be the representative" thereof; and that it is only where a dispute arises amongst the employees as to who are their representatives, that it becomes the duty of the Mediation Board under paragraph 9 of section 2 (45 U.S.C.A. § 152, par. 9) to investigate the dispute and to certify the names of the individuals designated to represent the employees; and that even in such case, the Board may either take a secret ballot of the employees involved or utilize any other appropriate method of ascertaining the names of the representatives. Hence it is suggested that the provision for secret ballot in the discretion of the Board should not change the interpretation of the clause that the majority of any craft shall determine its representatives, especially when the number of voters is fixed and definite and all of them have a special personal interest in the outcome; and if considerations of convenience and effectiveness of the statute are to influence the interpretation, that it should be borne in mind that if the majority of the eligible voters must agree upon the selection of the representative, there will be greater stability in employee representation, for where less than a majority approve a designated representative, there is a tendency for the losing party to seek another election, and the issue may not be regarded as definitely settled until a majority of the eligible voters agree upon their choice. Finally, it is pointed out that the literal interpretation was adopted by the Mediation Board before the decision of the District Judge in the instant case. We have carefully considered these arguments, but are of the opinion, for the reasons above stated, that the act should not be given so strict a construction, and that if a majority of the craft participate in an election, the majority of those voting is sufficient. Whether the choice of a majority of those voting would also be valid even if a majority of the eligible voters do not participate in the election is a question we need not now decide.

We need not consider at any length the criticism that both the mandatory and prohibitory features of the decree are without time limit, as the reasonable interpretation of the language used is that the defendant is directed to treat with the Federation so long as it is the representative of its employees and is restrained from treating with others as their representative so long as the Federation occupies that position. Nothing in the decree is to be construed as preventing the employees from choosing other representatives for the purpose of collective bargaining, at any time in the future, if they desire to do so, or as preventing the defendant from treating with such representatives when they are so chosen.

For the reasons stated, the decree appealed from will be affirmed.

Affirmed.